The People of the State of New York, Respondent, *v.* Bernard Gittelson, Appellant.

First Department, April 14, 1966.

*Joseph E. Brill* of counsel (*Robert E. Goldman* and *Bernard J. Levy* with him on the brief), for appellant.

*Burton B. Roberts* of counsel (*H. Richard Uviller* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

Eager, J. This is an appeal from a judgment of conviction grounded upon defendant's plea of guilty to 10 of the 27 counts of an indictment charging him with perjury in the first degree (felonies) in many instances of false testimony before a Grand Jury. The testimony was given in connection with an investigation of an alleged conspiracy to bribe a high-ranking New York City official to use his influence in the matter of awarding, without bidding, a contract for the purchase of parking meters by the city.

The defendant was sentenced to the Penitentiary of the City of New York for a term of one year and to pay a fine of $5,000 on each of the 10 felony convictions, with a direction that the prison terms of one year on the several counts should run concurrently. An alternate term of six months in the Penitentiary was imposed in lieu of the payment of the $5,000 fine on each of the 10 convictions, the 10 terms of six months to be served consecutively with each other and with the separately imposed one-year Penitentiary term.

This appeal is maintained by the defendant solely for the purpose of attacking the sentences which he alleges are unduly harsh and excessive. The sentences imposed were, however, well within the statutory limits — a "term not exceeding five years, or by a fine of not more than five thousand dollars, or by both" — applicable to each of the 10 convictions. (See Penal Law, § 1633.) Furthermore, it appears that the one year imprisonment in the Penitentiary on each count, to run concurrently, and the fine of $5,000 on each count, do represent a very carefully considered and well-grounded exercise of the sentencing court's discretion on the basis of the record and the presentence investigation data.

The defendant was the president, treasurer and part owner of a company engaged in public relations work. He or his company was retained by individuals representing a parking meter company interested in selling parking meters to the City of New York. On his representations that money would be needed for the alleged purpose of bribing city officials to purchase the particular meters, he induced the parking meter company or certain individuals associated therewith to pay over to him $50,000 to use for this purpose. As stated by the court at time of sentencing, "this was his scheme and he tempted the others into it. He persuaded one person after another to go along, to accept his own version. He slandered a high public official. He stole $50,000. He hatched stories and conspiracies to cover his transaction."

While appearing before a Grand Jury investigating the matter, after having received full immunity, the defendant deliberately chose to commit perjury in an attempt to thwart the investigation. At the time of his plea of guilty, he admitted that he had knowingly and willfully testified falsely in many instances with respect to the sources and purposes of the $50,000 and with respect to his conversations with a certain individual representing the parking meter company. Then, as stated by the court, "he collapsed only when he was faced by the inevitable".

At the time of his plea, on the admission that he had received the sum of $50,000 from the parking meter company, he was admonished as follows:

" You understand, Mr. Gittelson, that before you are to be sentenced in this case, before I will impose sentence, you will be called back before the Grand Jury before which you committed these various acts of perjury, and you will then again be called upon to testify in connection with these various matters, and you will then be called upon to tell the absolute truth with respect to all of these matters, fully, completely and fairly; do you understand that?

" The Defendant: Yes, sir.

" The Court: And do you understand that, in great measure, what happens to you on the sentence will depend upon the degree to which you do precisely that before the Grand Jury?

" The Defendant: Yes.

" The Court: You understand that?

" The Defendant: Yes."

Pursuant to this understanding, the defendant again appeared before the Grand Jury and testified at length in response to questions intended to elicit from him information concerning his disposal of the $50,000. The court, after reading some 500 pages of the Grand Jury testimony and on consideration of the exhibits, remarked:

" Here was a man who was in the habit of paying by check; who used accountants regularly, but who, all of a sudden spent a lot of cash, he said — cash, he said, which was all gone by May of 1962. And he kept switching from one story to another before the grand jury.

" One of the things he said is that he had spent this missing money out of pocket in some four-month period of time. This takes a lot of doing over and above one's regular income, over and above the regular salary that he was receiving and over and above the other cash that he had and he gave another explanation.

" He said that the reason that a lot of this money was claimed by him to have been spent a long time after his last visit to the box was that he took out ten thousand dollars in cash and had that lying around the house all of this time. Then he said that he used it on a number of trips to Europe, but it developed that he had only made one trip to Europe before May of 1962 from the time he got the second payment from Mr. D——— in Chicago.

" Then he said he bought art in Europe and the reason there was no customs declaration to back him up was that all of this

was stuff that didn't have to be declared and as the district attorney indicated, this came to a maximum of $200 a picture. And how this could have been brought back from Europe without records of some kind, I don't know.

'' Then he said he used it to buy things for the house, but the people who were the suppliers for the house came in and said in certain instances — indicated that they were not paid in cash, they were paid by check and he was given credit for the cash payments that were actually made.

'' The grand jury felt that his story was incredible. I arrive at the same conclusion. This man has failed to account for the money which he got from Mr. D———. He has failed to account for at least one-third of the second twenty-five thousand dollars and probably more. It isn't necessary to pinpoint this.''

These conclusions of the court were fully justified and, certainly, the court in fixing the sentences, properly took into consideration the defendant's evasiveness and lack of co-operation in his testimony before the Grand Jury.

On imposing sentences, the court stated specifically that '' there was an automatic, or built in, stay of the fines, or the alternative six months jail sentences, until he [the defendant] has finished with the Penitentiary sentences [one year] ''. The court undoubtedly had in mind the possibility that the defendant might yet fully co-operate with the District Attorney; the court stating that he was '' quite certain that the District Attorney will be glad to hear him and I will hear anything the District Attorney may have to say to me in the interval ''. It is well to note that, under the Code of Criminal Procedure (§ 484), the power exists in the court to remit a fine or any portion thereof; and insofar as defendant's lack of co-operation may have been a factor in fixing the fine, the defendant was not left without a remedy in case he demonstrated his willingness to assist the District Attorney or present satisfactory proof of his actual and truthful inability to give further material information in aid of the investigation.

Independent of and without regard, however, to the impression of the court that the defendant may have withheld information from the Grand Jury, the court undertook to and did impose proper and well-grounded sentences. The court was duly attentive to its responsibility to '' evaluate the possibilities of the rehabilitation of the defendant as a useful and responsible member of the community.'' (See *People* v. *Silver*, 10 A D 2d 274, 276 [VALENTE, J.].) In this connection, the defendant's present mental and emotional problems were fully considered as well as his alleged need for psychiatric therapy. On consid-

eration of psychiatric reports submitted prior to sentence, the court observed that the defendant " was a neurotic with a strong drive to get things done  *  *  *  This type of person is always full of anxieties, but withal, well adjusted because by his very anxiety, by his attention to detail, by his continually working and operating, he has been able to accomplish many things." The court noted that one of the psychiatrists had given the opinion that incarceration would be destructive of the defendant's chances for rehabilitation, but he also noted that another psychiatrist had in effect indicated that the psychiatrists' opinion may not " usurp the judicial prerogative in which many other social factors come into play in arriving at a decision other than psychiatric disability." Although conceding defendant's need for therapy, the court further observed that it was also imperative that people know that adequate punishment would be meted out for serious criminal acts, such as those committed by the defendant.

Notwithstanding the importance of the rehabilitative aspect in imposing sentence, a court should give due consideration to the fact that a sentence should " encompass the community's condemnation of the defendant's misconduct ". (*People* v. *Silver, supra,* p. 276.) Accordingly, the court below, in the exercise of its discretionary powers, was entitled to hold the punitive and deterrent factors as most important " particularly ", as was said, " when a crime of this kind has been committed ". In the course of " a balancing of considerations ", the court further said: " I ask myself the question as to whether this man is that sick that there will be complete and irreparable destruction of the man, and what is the impact of such destruction, if it does take place, upon society in general?  *  *  *  in any event, his lack of contrition and his sad performance before the grand jury hasn't earned him the right to probation. What will there be, rehabilitation from conditions which, for him, constitute normalcy? In any event, if he has had the strength to live the way he has lived and to accomplish what he has accomplished, I think he'll have the strength to bounce back from incarceration, and I am grateful for the fact that his children are not that small so that this will be a fatal blow to them."

The court disagreed with the District Attorney's recommendation of a State prison term, stating that he did not want " to extend this term unduly because if there is a risk of psychiatric injury or damage, I would rather diminish that risk by a definite term " in the City Penitentiary; " this has the added advantage of helping his family because if he's incarcerated in the peni-

tentiary of the city, it will be much easier—that much easier for his wife to visit him there and that I do encourage, for whatever support she can give him during this time."

It was especially appropriate that, in addition to the comparatively short term of imprisonment of one year, to run concurrently for the 10 felonies, the sentence included a substantial fine. These were crimes resulting from transactions "motivated by nothing but pure greed", the court said, significantly observing, also, that "the fifty thousand dollars * * * is money he stole. * * * I said at the time that this plea was taken that I wanted ten counts so that poetic justice or retribution might be done so that he might give up the fifty thousand dollars".

It is said that the fine has come to be more widely used in the United States, not only for convictions for minor misdemeanors, but also for many felonies. (Law of Criminal Correction [Rubin], ch. 6, "Fine" by Simon Rosenzweig, p. 230.) Where greed is a motivation for a crime, the imposition of a fine is held to be peculiarly appropriate. (Note, Fines and Fining—an Evaluation, 101 U. of Pa. L. Rev. 1018 [1950].) The view has been expressed that fines "should be the rule in punishment for crimes in which pecuniary profit is a motivating factor, and that the amount of the fine should be geared to the offender's capacity to pay and to taking the profit out of crime." (Law of Criminal Correction, *supra,* p. 238.)

Under the circumstances here, a small fine would serve no purpose. A substantial fine was justified to emphasize the gravity of the defendant's criminal acts, considered cumulatively, and as notice that the courts will take "the profit out of crime". It was proper and fitting that the defendant be stripped of his "ill-gotten gains."

Of course, the sentencing court in the imposition of a substantial fine with an alternate jail sentence on nonpayment thereof, should take into consideration the ability of the defendant to pay. (Law of Criminal Correction, ch. 7, *supra,* §§ 9, 10, 13, 17. See, also, Model Penal Code, § 7.02 [proposed official draft May 4, 1962].) Where a court imposes a fine which a defendant will not be able to pay and orders his imprisonment on default of payment, the court "has in effect passed a sentence of imprisonment; the fine is mere window dressing." (Law of Criminal Correction, ch. 7, *supra,* § 17.) But, here, the court fixed the fine with the expectation that the defendant could and would pay it. The record indicates that the court had reason to believe that the defendant would meet the fine. The court was informed that the defendant had been the recipient of an

income of upwards of $25,000 for many years; that he had engaged in extensive security transactions; that he owned and maintained his family in a $100,000 home; and that he had recently sold his interest in the public relations company, in which he was part owner, for various considerations and $250,000, payable at $25,000 a year for 10 years or until June, 1974.

Further, it appears that, beginning with the time the court took the defendant's plea of guilty, the court considered the advisability and propriety of imposing a $50,000 fine. As noted aforesaid, the court had made known to defendant that he " wanted ten counts so that poetic justice or retribution might be done so that he might give up the fifty thousand dollars ". The court undoubtedly believed that the defendant would pay the contemplated fine. In any event, it is very significant that, notwithstanding the court's remarks, at time of sentence, concerning the proposed fine, defendant's counsel at no time protested or placed on the record a statement that the defendant would not be able to pay the fine.

There is no factual support in the record or in presentence investigation data for defendant's contention made on this appeal that the fine is beyond his " capacity to pay "; and, absent such support and under the circumstances here, his alleged financial distress is not available on a review of the sentences.

It is an unavoidable consequence that criminal sentences, whether in the nature of fines or terms of imprisonment, may have a serious impact upon a defendant's family, his dependents and his friends, as well as upon the victim of the crime. The evil of the crime may touch the lives of many innocent persons. Where the breadwinner of a family is sentenced to serve a term of imprisonment, his wife and children may face immeasurable deprivations in their usual standards of living. Likewise, a family of a defendant who, as here, must pay a substantial fine, may suffer greatly by the serious depletion of his assets or the incurring of substantial indebtedness to pay the fine. A family may never fully recover from such consequences and the disgrace resulting from a defendant's crime. These results, with their serious social implications, are a matter of consideration for a sentencing court. Where, however, as here, the payment of fines imposed would require the defendant merely to disgorge the equivalent of what was criminally added to his funds and estate, the deprivation and suffering thereby visited upon his family are not adequate grounds for the remission of the fines.

The power conferred on the Appellate Division to reduce a sentence is the power to exercise mercy where the facts warrant

it. (See *People* v. *May,* 9 A D 2d 508, 514, citing *People* v. *Potskowski,* 298 N. Y. 299.) But, in exercising its power, this court must be guided by the facts disclosed in the record or demonstrated by a proper presentence investigation report or data. (See *People* v. *Gerstenfeld,* 14 A D 2d 517.) In the final analysis, the question is whether, on basis of such facts, there exists an abuse of the discretion vested in the sentencing court. Where, as here, the sentences were arrived at following a conscientious and thorough investigation and consideration of all relevant factors, this court should be loath to revise the manner and extent of the exercise of the sentencing court's discretion. (See 24A C. J. S., Criminal Law, § 1878; *People* v. *Caputo,* 13 A D 2d 861.) Here, the nature and scope of the defendant's criminal acts, the pertinent facts and proceedings appearing in the record, and the presentence investigation data furnish a rational and sound basis for the sentences imposed.

The judgment of conviction should in all respects be affirmed.

RABIN, J. (dissenting). I dissent because, in effect, this defendant is being found guilty of, and is being punished for, contempt of court for failure to talk, with a " built in " provision to give him an opportunity to purge — all without any questions having been asked, without a failure or refusal on his part to answer, without any charge having been made, and without a trial. Such procedure is violative of due process.

Upon defendant's plea to perjury, the court imposed a one-year jail sentence. In addition thereto, the court imposed a series of fines with alternative jail sentences in the event the fines were not paid. From the statement of the court at the time of sentencing, it is obvious that these fines and alternative jail sentences were imposed to compel the defendant to make additional disclosures, although there is no proof that there were such disclosures to be made. The petitioner pleaded guilty to perjury. He did not plead guilty to any charge of failing to make disclosures, nor was he found guilty of any such charge. If it could be proven that the defendant was willfully withholding information, the remedy would be to hold him for contempt. There is no justification for by-passing a hearing, which is a condition precedent to holding the defendant for contempt. This additional sentence does just that.

Defendant appeals from a judgment of the Supreme Court, entered on September 15, 1965, convicting him on his plea of guilty to 10 counts of perjury, and sentencing him to the Penitentiary for the term of one year, and to pay a fine of $5,000 on each count. An additional term of six months in the Peni-

tentiary was imposed on each count for which the fine was not paid, such terms to be served consecutively with each other.

This case arose out of an investigation commenced to ascertain whether there was, or had been, in existence a conspiracy among various persons doing, and seeking to do business with the City of New York to bribe a high-ranking official of the city government to use his influence to have awarded to them, without public bidding, a contract for the sale of parking meters to the city. Investigation revealed the defendant Bernard Gittelson, as having initiated the scheme, and as having represented that it would be necessary to pay $50,000 to a named official of the Municipal government in order that the Duncan Parking Meter Division of Nautec Corporation obtain a contract without public bidding, for the sale of 60,000 parking meters. The Grand Jury, before which the matter was being presented, found it necessary to obtain the testimony of Gittelson. Accordingly, he was called several times, awarded complete immunity for his role in the transaction, and questioned concerning the money allegedly put at his disposal. On repeated occasions (as subsequently developed) he lied to the jury, denying knowledge of the arrangement. As a result, the Grand Jury investigation came to a halt and the defendant was charged with perjury.

Defendant was charged with 27 counts of perjury and, after some delays, trial began on May 10, 1965. After the People's opening statement, defendant offered to plead guilty to 10 counts and, after a *voir dire* examination of the defendant, the court accepted the plea.

The defendant, after pleading guilty, undertook to return to the Grand Jury to tell the truth. His disclosure, upon his return to the Grand Jury, was full and complete enough to establish him guilty, not only of perjury, but also of larceny. Of course, he deserved punishment, but it is my view that the sentence was, in the circumstances of the case, unconscionably severe. I would modify the sentence imposed.

At the time of sentence, it was revealed that during the course of the defendant's initial appearances before the Grand Jury, he was undergoing psychiatric treatment. The necessity for such treatment might have been the result of various personal problems to which he had been subjected, among them being the senility of his father, the death of his friend and partner, the illness of his brother-in-law, and severe financial losses. These events, coupled with the impending investigation by the District Attorney, could very well have been factors in bringing about Gittelson's mental and emotional problems, necessitating psychiatric treatment which, as above indicated, he was undergoing

at the time of his appearance before the Grand Jury. While his mental condition does not condone the perjury which formed the basis for the underlying indictment, that fact, together with the circumstances which apparently gave rise to such condition, is of importance and is relevant to the sentence imposed.

It is to be noted, that on the day Gittelson pleaded guilty, the court inquired of the defendant if he was willing to submit to a full examination and consultation by a psychiatrist designated by the court. The defendant agreed and, in addition, waived his privilege of confidentiality. At the time of sentencing, there was before the court the report of the court-designated psychiatrist, specifically appointed to advise the court with respect to Gittelson's mental condition, insofar as it bore on the sentence to be imposed.

The report, as submitted to the court, concluded with the following sentence: "Mr. Gittelson, considering his past record, by my present examination and by the fact that he is well-motivated toward psychotherapy is fully capable of rehabilitation to again become a useful and honorable member of the community. It is my impression that incarceration in prison for any period of time, long or short, would be instrumental in destroying the patient and would make future rehabilitation impossible."

What goals are to be achieved in the imposition of sentence? Without listing them in the order of importance, I would say that a sentence is imposed for punishment, to act as a deterrent, and, if possible, to effect the rehabilitation of the person sentenced. Of course, the court need not consider one to the exclusion of the other. In this case, it was not obliged to follow the seeming recommendation of the psychiatrist that, in the interest of rehabilitation, no jail sentence be imposed. But, it does seem that in determining the length of penal servitude to be meted out to this defendant, the court—in balancing the various factors—arrived at the conclusion that the interests of society would be served if he were sentenced to serve one year in jail. That was the sentence imposed with respect to penal servitude.

However, it may very well be that this defendant will be obliged to serve five additional years in the event that he cannot meet the required payments of the fines. It is that possibility that makes this sentence to be what I consider an unconscionable one. The possible duration of penal servitude would go well beyond the one year arrived at by the court as being sufficient in the circumstances to answer for the perjury. And, I think it would completely defeat and eliminate all consideration of the possibility of rehabilitation—if we are to give any weight to the report of the court-appointed psychiatrist.

In considering the sentence given the defendant, it would not be improper to consider the treatment of the others who were involved in the scheme. Jerome Robinson received a suspended sentence. Alexander Rittmaster, Garlick and Gordon were given sentences of $500 or 60 days. Robert Rittmaster, who was not involved in any perjury, received a sentence of $250 or 30 days. While it may be said, and perhaps properly so, that Gittelson was deserving of much greater punishment than his co-conspirators, that, I believe, was accomplished sufficiently by having him serve the one-year sentence.

What then led the court to impose the alternative sentence of five years, in the event he does not pay the $50,000? The answer appears to be very clear. It appears that the court felt that Gittelson withheld something from the Grand Jury upon his return after his plea of guilty, and he was withholding something from the District Attorney and the court. It is quite apparent that the court was of the opinion that Gittelson was concealing the name or names of others who might have been recipients of some part of the money advanced to bribe public officials. That conclusion is indicated by the great stress laid by the District Attorney, at the time of sentence, upon the alleged failure of Gittelson to account adequately for the money he received. I disagree that Gittelson failed to give an adequate account in the circumstances. However, even if the conclusion were a proper one, how does it justify the further conclusion that the balance, allegedly unaccounted for, was given as a bribe to a person or persons, whose names Gittelson is withholding?

It might be well to here note the statement made by the District Attorney at the time he recommended that the court take the plea of the defendant. He said: " [i]f a rumor is brooded about that there may be a payoff to a public official people presume that there was one. It is now quite clear there was no payoff to   *   *   *   any official." The District Attorney cannot have it both ways. He cannot say that it is " quite clear there was no payoff to   *   *   *   any official " and at the same time insist on additional punishment of this defendant for failure to name officials on an inference that payoffs were indeed made.

And it is quite clear from the court's statement, at the time of sentencing, that it came to the conclusion — although, I think, without a proven basis — that there was such withholding. The court said: " Now, obviously, there was an automatic, or built in, stay of the fines, or the alternative six months jail sentences, until he has finished with the Penitentiary sentences. He has got a lot of time to wait for those. I do not know what he is going to do in the interval, but in the event that he decides that

he wants to talk to the District Attorney, in the event that he decides that there are other things that he remembers that he wants to tell the District Attorney, I am quite certain that the District Attorney will be glad to hear him and I will hear anything the District Attorney may have to say to me in the interval, because I said, in effect, the fines or the alternative prison sentences will be stayed automatically until he has finished the Penitentiary concurrent terms.''

The court was quite frank to point out, in effect, that the imposition of the additional fines and consecutive alternative sentences was nothing other than a device to compel further disclosures. Thus, it is apparent that this defendant was given additional punishment through this '' automatic or built in '' device to compel him to talk more, when it was not at all proven — as the District Attorney indicated — that there is more to be said. It has been held that an alternative jail sentence is not punishment and may properly be imposed to coerce the payment of fines. (*Matter of McKinney* v. *Hamilton,* 282 N. Y. 393.) While I do not approve of such policy, it is evident here, from the court's statement that the alternative jail sentence was not imposed to coerce the payment of the fines, but rather imposed to coerce further disclosures. It seems that we have not made too far an advance over the medieval use of the rack and screw. Nor is the availability of section 484 of the Code of Criminal Procedure, which permits of an application to remit the fines, any justification for now imposing such fines and alternative jail sentences as a coercive measure to compel him to talk. To remit the fines in the event that he should talk allows for what I think is an unlawful purpose — a sentence to compel disclosures. I, therefore, think that the alternative jail sentences were improperly imposed, are uncalled for, and should be stricken. Indeed, I believe that the possibility of an additional five years, to be added to the defendant's sentence for the failure to pay the fines, makes the entire sentence so severe as to violate the constitutional prohibition against the infliction of cruel and unusual punishment.

Quite apart from the above — even though it may not be improper to impose a jail sentence as an alternative to a fine, provided it be not too severe — it is to be fairly questioned whether such a sentence was proper here, where it is apparent that Gittelson does not have the means to pay the fine. It leads me to ask the question as to whether Gittelson was being given the additional sentences for the perjury committed or possibly for not having the $50,000, assuming, of course, that he is not being penalized (as I believe he is) for failure to give informa-

tion, the existence of which, to my mind, was not proven. The imposition of the alternative sentences nullified the basis of the one-year sentence, and is entirely disproportionate thereto. It makes the entire sentence an oppressive one.

There must be, and there is, a more enlightened and more progressive manner to treat a defendant who is unable to pay a fine imposed. The Congress of the United States found it when it enacted section 3569 of title 18 of the United States Code. It, in effect, provides that upon the taking of a proper oath, indicating an inability to meet a fine, a defendant may be released after 30 days' service. True, the New York Legislature has made no provision for release in the event of inability to pay a fine. Nor does section 484 of the Code of Criminal Procedure seem to afford any relief in such circumstance (*People* v. *Baker*, 183 Misc. 113). Be that as it may, section 484 does not preclude a defendant from attacking, on appeal, what he considers to be an improper sentence, nor is it an alternative for such appeal. However, the failure of the Legislature to make adequate provision for the inability to pay a fine would not prevent a court, in its sentence, from providing for proper relief. Or, to put it conversely, the absence of such a provision does not justify the severity of the alternative sentence here imposed.

In view of the foregoing, it is my feeling that a one-year sentence is quite sufficient — if not more than sufficient — in the circumstances of this case. I arrive at that conclusion upon taking all of the factors into consideration, including the defendant's mental condition at the time of the commission of the perjury, the recommendation of the court-appointed psychiatrist, his prior history in business and in charitable service, and the many communications of people of standing, urging leniency.

BREITEL, J. P., and WITMER, J., concur with EAGER, J.; RABIN, J., dissents in opinon; VALENTE, J., deceased.

Judgment of conviction affirmed.