**Marzette TRAYLOR, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Nov. 15, 1982.

Decided: March 22, 1983.

Bettina C. Ferguson, Wilmington, for appellant.

James B. Ropp, Deputy Atty. Gen., Wilmington, for appellee.

Before HERRMANN, C.J., McNEILLY and MOORE, JJ.

MOORE, Justice:

Following a jury trial, Marzette Traylor was convicted of trafficking in illegal drugs [16 Del.C. § 4753A(a)(3)], receiving a sentence of three years in prison and a $75,000 fine.[1] In his appeal from that conviction, he contends that the police improperly searched his car and that he did not knowingly and intelligently waive his *Miranda* rights before making a statement. He also argues that section 4753A bears no rational relationship to the control of illegal drug sales, thus violating the equal protection clause of the fourteenth amendment. Finally, he asserts that the mandatory imposition of a $75,000 fine constitutes cruel and unusual punishment which is prohibited by

---

1. Two other charges, driving with a suspended driver's license and maintaining a motor vehicle for the delivery of illegal drugs, were dismissed by the State.

the eighth amendment. We consider these points to be without merit, and we therefore affirm the defendant's conviction.

## I.

### A.

In January 1982, three undercover police officers were on patrol near the corner of Sixth and Madison Streets in Wilmington. That particular corner, a known drug-dealing area, had been the subject of several anonymous citizen complaints. As the officers first approached the intersection, they saw Traylor, who they knew to be the subject of then-pending drug-related charges, sitting in the driver's seat of a parked car. After spotting him they drove around the block, parking about a block away to observe him. During the next half hour, the police saw five or six people enter Traylor's car at various times. Each person remained in the car with Traylor for two or three minutes and then left. Traylor only got out of the car once, when no one was with him.

After observing the activity, the officers checked with police headquarters to determine if Traylor had a valid driver's license or if there were any outstanding warrants on him. They learned that his license had been suspended, and they then asked for uniformed officers to be sent to the scene. Waiting for the additional officers, they saw another person drive up to Traylor's car and help him start the car. Traylor immediately drove away, and a uniformed policeman, followed by the undercover officers, stopped him a few blocks away.

Traylor was told he was under arrest for driving while his license was suspended (21 Del.C. § 2756). One officer told him to step out of the car, and a frisk of Traylor revealed that he had over $600 in a pants pocket. While Traylor was being handcuffed and searched, another officer started to search the car and immediately saw two large mittens or ski gloves in the middle of the front seat. Looking inside them, he saw several plastic bags filled with a white powder which later was determined to be heroin. A quick search of the car uncovered no other evidence.

Defendant moved to suppress this evidence, alleging that it was obtained in violation of the fourth amendment, but the trial court denied the motion. Traylor argues the warrantless search of his car was not justified as a search incident to arrest or under the automobile and plain view exceptions to the fourth amendment. The State contends that the search was permissible either as one incident to arrest or under the automobile exception. We conclude that under *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), defining the scope of a search incident to arrest when the arrestee is driving a car, the police conducted a proper search.

### B.

■ *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), is the principal modern case on the doctrine of search incident to arrest. In order to protect himself and to prevent the concealment or destruction of evidence, an arresting officer may search the arrested person and "the area from within which he might gain possession of a weapon or destructible evidence". *Id.* at 763, 89 S.Ct. at 2040. Though *Chimel* specifically defined the extent to which the police could search the house in which the defendant had been arrested, the rule in *Chimel* has been applied when the defendant was the occupant of a car. Prior to the decision of the United States Supreme Court in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the permissible scope of a search of an automobile after the arrest of its occupants was in confusion since the search depended on the facts of each case, e.g., the proximity of the defendant to the car, the degree of restraint on the defendant, and the number of police compared to the number of suspects. *See Belton,* 101 S.Ct. at 2863. Instead of a case-by-case approach, *Belton* applies one rule: "when a policeman has made a lawful custodial arrest of the

occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile". *Id.* 101 S.Ct. at 2864. Any container found within the passenger compartment may also be examined. *Id.*

■ Based on the fact that he was initially stopped for a traffic offense, Traylor argues that he was arrested solely in order to justify a search of his car. We recognize "the possibility that a police officer, lacking probable cause to obtain a search warrant, will use a traffic arrest as a pretext to conduct a search". *United States v. Robinson,* 414 U.S. 218, 248, 94 S.Ct. 467, 482, 38 L.Ed.2d 427 (1973) (Marshall, J., dissenting). *See Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 2859, 69 L.Ed.2d 744 (1981) (Stevens, J., dissenting); *State v. Culver,* Del.Supr., 288 A.2d 279, 285 (1972). Delaware law, though, gives a police officer the discretion to make a custodial arrest for violation of any motor vehicle law [21 *Del.C.* § 703(a), (b) ],[2] and the exercise of that discretion, in itself, does not invalidate the search. *Gustafson v. Florida,* 414 U.S. 260, 265, 94 S.Ct. 488, 491, 38 L.Ed.2d 456 (1973). *See Robinson,* 414 U.S. at 221 n. 2, 94 S.Ct. at 470 n. 2. Furthermore, the arrest can hardly be called a pretext since the officers, learning that Traylor had a suspended driver's license, had probable cause to arrest him when they saw him drive away. It follows that when Traylor's car was searched, the police had made "a lawful custodial arrest".

■ Traylor also questions the need for the search since there was no evidence of the traffic offense that was in danger of being destroyed. That argument has been consistently rejected, and we reject it here. *Robinson,* 414 U.S. at 235, 94 S.Ct. at 476–77; *Gustafson,* 414 U.S. at 265–66, 94 S.Ct. at 491–92; *Culver,* 288 A.2d at 283. *See Belton,* 101 S.Ct. at 2864. In addition, he contends that he had no chance of obtaining any evidence or weapon from the car since at the time of the search, he had been removed from his car and handcuffed. Because he had no access to any part of the car, defendant argues, the search was unjustified under *Chimel.* In light of *Belton,* this argument has no force, and on facts substantially identical to this case, the search of a lunch pail that contained cocaine was held proper under *Belton.* *United States v. Enriquez,* 675 F.2d 98 (5th Cir. 1982). *See Belton,* 101 S.Ct. at 2865 n. 5; *United States v. Singer,* 687 F.2d 1135 (8th Cir.1982); *United States v. Burns,* 684 F.2d 1066 (2d Cir.1982); *Government of Virgin Islands v. Rasool,* 657 F.2d 582 (3d Cir.1981). *Cf. United States v. Fleming,* 677 F.2d 602 (7th Cir.1982) (arrest on front porch of house); *United States v. Brown,* 671 F.2d 585 (D.C.Cir.1982) (arrest on street corner).

■ As we concluded above, Traylor was the subject of a lawful custodial arrest on a charge of driving with a suspended driver's license. The search of the car, instantly revealing the presence of the gloves containing packets of heroin, followed immediately upon that arrest. The gloves were located inside the passenger compartment of Traylor's car, and they were therefore in the area which was within Traylor's immediate control as defined by *Belton.* The search of the gloves was one incident to a

**2.** At the time of Traylor's arrest, 21 *Del.C.* § 703(a) and (b) stated in relevant part:

(a) A person arrested without a warrant in the City of Wilmington for a violation of any section of this title shall be taken before a Judge of the Municipal Court for the City of Wilmington, except that persons arrested for a violation occurring on any part of the interstate highway system may be taken before the nearest available justice of the peace from the place of arrest. . . .

(b) Notwithstanding subsection (a) of this section the arresting officer may issue a summons to the person arrested for appearance at a subsequent date at the Justice of the Peace Court which is the nearest available Justice of the Peace to the place of the arrest. For the purpose of this section, the summons for later appearance at the nearest available Justice of the Peace to the place of the arrest, during the regularly scheduled hours of said Court, shall be sufficient to grant jurisdiction over the offense charged to the said nearest available justice of the peace.

lawful custodial arrest, and it did not violate Traylor's rights under the fourth and fourteenth amendments.[3]

## II.

During the trial, the State also introduced into evidence various remarks Traylor had made to the police.[4] Traylor and several police officers testified at a suppression hearing regarding these statements. According to the policemen, Traylor was given the *Miranda* warnings at the scene immediately after several plastic bags were found in a pair of gloves. At that time, he seemed to understand what was being said to him. He was taken to the police station and the police again recited the *Miranda* warnings after processing Traylor. Asked if he understood his rights, his reply was, "Yes, I do. I understand them." Traylor, in the officers' opinion, did not appear to be under the influence of any drug, and he was aware of what was happening at the police station.

Traylor's testimony was in stark contrast to that of the police. No *Miranda* warnings were ever given to him at any time. Though three officers testified that they had been present when Traylor made his remarks, Traylor said only one of the three had been there. That particular officer did not advise Traylor of his *Miranda* rights since he knew Traylor was aware of them. Much to Traylor's surprise, the officer asked about the drugs found in the gloves. He testified that he had used an unknown amount of heroin immediately before leaving the house the day of his arrest, about one and one-half hours prior to his arrest, and was still under its influence when he was questioned. He acknowledged, however, that he had understood what was happening when he was arrested and questioned.

Traylor now argues that when he was questioned, he was under the influence of heroin.[5] Therefore, he continues, he was incapable of intelligently and knowingly waiving his *Miranda* rights. In response, the State contends that the statement and the circumstances in which Traylor gave the statement support the conclusion that he waived his rights.

These arguments are similar to those presented in *Howard v. State*, Del. Supr., 458 A.2d 1180 (1983), and our analysis here parallels *Howard*. As we said in

3. In light of this disposition, there is no need to consider whether the search and seizure were permissible under the "automobile exception" to the fourth amendment. *Accord Belton*, 101 S.Ct. at 2865 n. 6.

4. As one of the arresting officers testified:

Q [deputy attorney general]: What, in substance, was the conversation that you had with him and what prompted him to speak, if you know?

A [police officer]: After filling out the arrest reports, I advised him of his Miranda rights, and after reading him his Miranda rights, I asked him if he had—if he wanted to talk about what happened that day and, you know, if he wanted to volunteer any information as far as his participation in drug dealings and how his organization was run or who he was—you know, who he was linked or involved with as far as—as far as in dealing with drugs. At that point Mr. Traylor kind of chuckled and laughed and said, "You know you got me. You know, what can I say?" He says, "I'm not linked to any big organization. You think I'm apparently in some kind of big heroin organization. I'm not." He said, "I'm a junkie.

I go to New York, cop some heroin, bring it back for myself and friends who are also junkies, and that's how I get by." He says, "I don't buy a big quantity of heroin and make a lot of money off of it. I just get by."

Q: Did he say how much he was selling different quantities of heroin for?

A: Yes. He said he was selling New York quarters, which is a street term for an amount of heroin, for fifty dollars and half a New York quarter for thirty-five dollars.

\* \* \* \* \* \*

Q: Now, you said he stated to you that he's a junkie and he sells to his friends who are junkies after he copped heroin in New York. What does that mean?

A: The term "cop" you mean?

Q: Yes.

A: Slang term that they use on the street meaning acquiring or purchasing drugs, making a connection with somebody. They refer to that as copping drugs.

5. He does not contend that the police failed to advise him of the *Miranda* rights.

that case, the State must show not only that the defendant was advised of his *Miranda* rights but that waiver of those rights was knowing and intelligent. *Howard,* 458 A.2d at 1183. These issues are to be decided after examining " 'the totality of the circumstances including the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors.' " *Id.* [quoting *Whalen v. State,* Del.Supr., 434 A.2d 1346, 1351 (1981) ]. The evidence at the suppression hearing established that Traylor had twice received *Miranda* warnings and indicated both times that he understood them. Traylor used an unknown amount of heroin about 11:00 a.m. the day of his arrest, and his statement was given at least two hours later. To the extent that he was under the influence of any drug when he was questioned, his condition does not *per se* invalidate an otherwise proper waiver of rights. *State v. Gordon,* Me.Supr.Jud.Ct., 387 A.2d 611 (1978); *Commonwealth v. Cornish,* Pa. Supr., 471 Pa. 256, 370 A.2d 291 (1977); 3 Wharton's Criminal Evidence § 689, at 481 (13th ed. 1973). *See Howard,* 458 A.2d at 1183 (intoxication caused by alcohol). Instead, the question is whether Traylor had sufficient capacity to know what he was saying and to have voluntarily intended to say it. *Cornish,* 370 A.2d at 297. When the *Miranda* warnings were given, Traylor said then he understood them, and he so testified later. His remarks were specific in nature, describing his routine of going to New York for heroin supplies, even though the police questions were only directed towards drugs in general. In addition, Traylor's recollection of his arrest and interrogation negates any implication that his mental capacity was impaired when he was questioned. The admissions and denials in his remarks also indicate his capacity and intent. We conclude that the State proved Traylor to have knowingly and intelligently waived his rights. It follows, therefore, that the statement was properly admitted into evidence.

## III.

### A.

The statute under which Traylor was convicted, 16 *Del.C.* § 4753A,[6] creates a classification scheme that makes the severity of the crime dependent upon the weight of the mixture containing the illegal substance and not upon the purity of the substance. Traylor asserts that this approach offends the constitutional guarantees of equal protection under the law. Supporting this contention, he points out that a person convicted of possessing 7 grams of 100% heroin would be treated less severely than a person convicted of possessing a mixture of .01 gram of 100% heroin and 7.99 grams of quinine.[7] According to Traylor, there is no rational justification for this distinction, and thus, the statute bears no rational relationship to the suppression of drug trafficking.

In determining whether a statutory classification, not involving a suspect

---

**6.** The portion of the statute related to trafficking in heroin reads:

Any person who, on any single occasion, knowingly sells, manufactures, delivers or brings into this State, or who is knowingly in actual or constructive possession of 8 grams or more of any morphine, opium or any salt, isomer or salt of an isomer thereof, including heroin, as described in § 4714 of this title, or 8 grams or more of any mixture containing any such substance, is guilty of a class B felony, which felony shall be known as "trafficking in illegal drugs". If the quantity involved:

a. Is 8 grams or more, but less than 20 grams, which person shall be sentenced to a

mandatory minimum term of imprisonment of 3 years and to pay a fine of $75,000.

b. Is 20 grams or more, but less than 50 grams, such person shall be sentenced to a mandatory minimum term of imprisonment of 10 years and to pay a fine of $150,000.

c. Is 50 grams or more, such person shall be sentenced to a mandatory minimum term of imprisonment of 25 years and to pay a fine of $750,000.

16 *Del.C.* § 4753A(a)(3).

**7.** The first person would be subject to prosecution under 16 *Del.C.* § 4751(a), discussed in part IV-A of this opinion.

class or fundamental right, violates the equal protection clause, we presume that the distinctions so created are valid. *Justice v. Gatchell,* Del.Supr., 325 A.2d 97, 102 (1974). "A statutory discrimination or classification will not be set aside if any state of facts reasonably may be conceived to justify it." *Id.; Kreisher v. State,* Del. Supr., 303 A.2d 651, 652–53 (1973). When the General Assembly classifies for the purpose of defining a crime, "the classification must be founded on differences reasonably related to the purposes of the statute in which the classification is made". *State v. Ayers,* Del.Supr., 260 A.2d 162, 171 (1969). See *Tusso v. Smith,* Del.Supr., 162 A.2d 185, 187–88 (1960).

 Traylor's claim is identical to that made against similar laws in Florida, Illinois, Michigan, and New York and rejected by the courts. *United States ex rel. Daneff v. Henderson,* 501 F.2d 1180 (2d Cir.1974); *State v. Yu,* Fla.Supr., 400 So.2d 762 (1981); *People v. Mayberry,* Ill.Supr., 63 Ill.2d 1, 345 N.E.2d 97 (1976); *People v. Campbell,* Mich.App., 115 Mich.App. 369, 320 N.W.2d 381 (1982); *People v. Lemble,* Mich.App., 103 Mich.App. 220, 303 N.W.2d 191 (1981). As noted by the courts in those cases, dangerous drugs are generally marketed in a diluted or impure form. If illegal substances are so distributed, then the General Assembly does not act irrationally or unreasonably when it addresses the marketing of the compound rather than the pure form of the drug. Drug dealers at the bottom of the distribution chain obviously need a source of supply if they are to make sales. It is equally clear that major traffickers need a network of people to make the actual sales to users. Stiff penalties for possession of a mixture that contains an illegal drug are therefore rational since traffickers may be less able to find street-level peddlers willing to risk possession of large, but diluted, amounts of illegal drugs. As the Michigan Court of Appeals also observed,

"the small street vendor of illegal substances tends to attract unsavory elements to a neighborhood or area the way that a major dealer does not. . . . While, obviously, the major trafficker is ultimately the cause of this crime, his presence in an area does not have the same sort of direct adverse consequences on the local citizenry. Thus, an argument can be made that street pushers are at least as harmful as dealers." *Campbell,* 320 N.W.2d at 383. We therefore conclude that the classifications drawn by section 4753A are reasonably related to suppression of the drug traffic, thereby satisfying the demands of the equal protection clause.

### B.

 Traylor further contends that the statute creates an irrebuttable presumption that anyone possessing eight or more grams of a heroin mixture is engaged in trafficking the drug. An irrebuttable or conclusive presumption is impermissible only "when the presumed fact is a necessary element of a criminal offense. . . ." *Craig v. State,* Del.Supr., 457 A.2d 755, 760 (1983). "Trafficking", though, is not an element of the offense but the name of the crime, as the statute makes clear. Furthermore, the statute contains no presumption, rebuttable or conclusive, as alleged by Traylor. Thus, this claim has no merit.

### IV.

### A.

Traylor's final argument is that the imposition of a $75,000 fine, as required by 16 *Del.C.* § 4753A(a)(3)a,[8] constitutes cruel and unusual punishment in violation of the eighth amendment. Because he is indigent, he contends that the large fine will require him to work several years in order to pay it. The State responds that under the guidelines set out in *Hindt v. State,* Del.Supr.,

8. The statute is set out in note 6, *supra.*

421 A.2d 1325 (1980), the fine is constitutional.[9]

■ As this Court observed in *Hindt*, there is "very little case law" delineating the limits of a constitutionally permissible fine. 421 A.2d at 1333. *Hindt*, however, does indicate what should be considered when reviewing an allegedly excessive fine: the statutory objective, the importance and magnitude of the public interest sought to be protected, the circumstances and nature of the act for which the fine is imposed, the defendant's ability to pay, statutory penalties for the same offense in other jurisdictions, and possible penalties for other offenses committed in Delaware. *Id.*

We are well aware that the organized traffic in illegal drugs is a serious problem, causing not only debilitating effects in those who use such substances, but fostering additional crimes. Drug trafficking now generates profits in the billions of dollars for those involved in it, and the large mandatory fines are a legitimate effort to undercut these enormous, but illegal, profits. Delaware's law is also designed to aid law enforcement officers in their investigation and prosecution of the drug traffic regardless of where a defendant may stand in the distribution chain. Thus, the statutory penalties are calculated to provide a strong incentive for violators to cooperate with the police, becoming eligible in the process for a sentence reduction under 16 *Del.C.* § 4753A(c).[10]

■ Responding to the increased trafficking in illegal drugs, the legislatures of other states have enacted laws similar to section 4753A.[11] Under these laws, Traylor would have been sentenced in Florida and Alabama to three years in prison and fined $50,000; in North Carolina, his sentence would have been fourteen years in prison and a minimum fine of $50,000. Delaware law, as applied to Traylor, is harsh, but not so harsh as to be disproportionate to his offense when compared to the laws of other states. If section 4753A did not exist, Traylor would have been subject to prosecution under 16 *Del.C.* § 4751(a). According to section 4751(a), a person, addicted to narcotic drugs, "who manufactures, delivers or possesses with intent to manufacture or deliver" heroin could be sentenced to a maximum of twenty-five years imprisonment and fined $5,000 to $50,000.[12] The General Assembly, though, could conclude that those

9. We accept for the moment Traylor's claim of indigency. To support the claim, defense counsel only refers us to the affidavit that was filed when in forma pauperis status was sought on this appeal. In other circumstances, that approach may be inadequate to establish a factual basis for arguments such as those made by Traylor. *See generally City of Orlando v. Cameron*, Fla.Supr., 264 So.2d 421 (1972); *People v. Jenkins*, N.Y.App., 64 Misc.2d 826, 316 N.Y.S.2d 475 (1970); *People v. Gittelson*, N.Y.App., 25 App.Div.2d 265, 268 N.Y.S.2d 779, *aff'd*, N.Y.Ct.App., 18 N.Y.2d 427, 276 N.Y.S.2d 596, 223 N.E.2d 14 (1966).

10. That section reads:
The Attorney General may move the sentencing court to reduce or suspend the sentence of any person who is convicted of a violation of this section and who provides substantial assistance in the identification, arrest or conviction of any of his accomplices, accessories, co-conspirators or principals. Upon good cause shown, the motion may be filed and heard in camera. The judge hearing the motion may reduce or suspend the sentence if he finds that the defendant rendered such substantial assistance.

11. *E.g.*, Ala.Code § 20–2–80 (Supp.1982); Fla. Stat.Ann. § 893.135 (West Supp.1983); Ga. Code Ann. § 79A–811 (Supp.1982); Ill.Ann. Stat. ch. 56½, § 1401 (Smith-Hurd Supp.1982–83); Mich.Comp.Laws Ann. §§ 333.-7401(1), .7403(1) (1980); N.C.Gen.Stat. § 90–95(h) (1981); S.C.Code Ann. § 44–53–370(e) (Law. Co-op.Supp.1982).

12. The statute proscribes such conduct with respect to "a controlled substance or a counterfeit controlled substance classified in Schedule I or II which is a narcotic drug." 16 *Del.C.* § 4751(a). Heroin is classified in Schedule I [16 *Del.C.* § 4714(c)(10)], and it is defined as a narcotic drug because it is a "derivative or preparation of opium or opiate" [16 *Del.C.* § 4701(18)a].

penalties were inadequate to remove the profit motive behind the drug traffic, thus requiring imposition of a large fine. *Compare Hindt,* 421 A.2d at 1333. In light of these factors, the fine imposed as part of Traylor's sentence does not violate the eighth amendment. *Accord Wheatt v. State,* Ala.Cr.App., 410 So.2d 479 (1982); *State v. Benitez,* Fla.Supr., 395 So.2d 514 (1981).

### B.

■ We also reject Traylor's assertion that he, an indigent defendant, can not constitutionally be required to pay the $75,-000 fine.[13] The logical extension of Traylor's contention shows its absurdity: any fine would be excessive simply because he is unable to pay. *Wheatt v. State,* Ala.Cr. App., 410 So.2d 479, 481 (1982). Because an indigent offender can not be imprisoned for his inability to pay his fine [11 *Del.C.* § 4105(a); *see State v. Bender,* Del.Super., 283 A.2d 847 (1971)], the position advocated by Traylor would lead to inverse discrimination since an indigent could avoid the fine and imprisonment for nonpayment and other defendants would always suffer one or the other punishments. To avoid this result, Delaware allows a fine to be paid in installments [11 *Del.C.* § 4104(a)(2)], through an assignment of earnings [*id.* § 4104(c)], or by working on an approved public work assignment [*id.* § 4105(b)]. These alternatives satisfy the requirements of the equal protection clause of the fourteenth amendment. *Bender,* 283 A.2d at 851. *See Williams v. Illinois,* 399 U.S. 235, 244–45 & n. 21, 90 S.Ct. 2018, 2023–24 & n. 21, 26 L.Ed.2d 586 (1970).

■ Relying on *Opinion of the Justices,* N.H.Supr., 121 N.H. 531, 431 A.2d 144 (1981), Traylor claims that any compulsory uncompensated labor required to satisfy his fine[14] would constitute involuntary servitude. That case involved the state's ability to recover counsel fees expended on behalf of indigent defendants. The repayment of such fees was held not to be part of the punishment for a crime, and the state could not, under the thirteenth amendment, compel an indigent defendant to perform uncompensated labor to satisfy his debt. 431 A.2d at 151. Traylor, though, has been properly convicted of a crime, and the thirteenth amendment allows involuntary servi-

---

**13.** As required by 11 *Del.C.* § 9012(a), a 10% surcharge of the fine, payable to the Victim Compensation Fund, was imposed upon Traylor. We treat this surcharge as a fine for the purposes of our analysis.

**14.** Such service is allowed under 11 *Del.C.* § 4105(b) which reads in relevant part:

Where a person sentenced to pay a fine, costs, restitution or all 3, on conviction of a crime is unable or fails to pay such fine, costs, restitution or all 3, at the time of imposition of sentence or in accordance with the terms of payment set by the court, the court may order the person to report at any time to the Commissioner of the Department of Correction, or a person designated by him, for work for a number and schedule of hours necessary to discharge the fine, costs or restitution imposed. For purposes of this section, the hourly rate shall be established in accordance with the then prevailing federal minimum wage, and shall be used in computing the amount credited to any person discharging fines, costs and restitution.... The De-partment may approve public work assignments for convicted persons in accordance with subsection (c) of this section, whereupon the Commissioner, or a person designated by him, may assign the convicted person to work under the supervision of any state, county or municipal agency on any project or assignment specifically certified for that purpose. The Department of Correction shall not compensate any convicted person assigned to work under the supervision of any state, county or municipal agency but shall credit such person with the number of hours of satisfactory service. When the number of such hours equals the number of hours imposed by the court, the Department shall certify this fact to the appropriate court, and the court shall proceed as if the fines, costs and restitution had been paid in cash. Fines, costs and restitution successfully worked off in the above manner shall not be considered as receivables of the court, but the records shall show the hours worked....

tude "as a punishment for crime whereof the party shall have been duly convicted...." *See Dunn v. Mayor of Wilmington,* Del.Supr., 219 A.2d 153 (1966). The fine imposed upon Traylor is clearly part of the punishment for his crime, and compulsory labor to satisfy the fine is proper under the thirteenth amendment. *Cf. Hayes v. City of Wilmington,* 451 F.Supp. 696 (D.Del. 1978) (imposition of 1000 penalty hours for violation of fire department rules does not violate thirteenth amendment).

\* \* \*

AFFIRMED.