**UNITED STATES of America, Appellee,**

v.

**Elmer Arias ACOSTA, Defendant–Appellant.**

**No. 780, Docket 91–1527.**

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1992.

Decided May 13, 1992.

John D. Patten, New York City, for defendant-appellant.

Charles D. Hammerman, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Susan Corkery, Asst. U.S. Atty., E.D.N.Y., of counsel), for appellee.

Before VAN GRAAFEILAND, CARDAMONE and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Both Congress and the Sentencing Commission have made clear that, to penalize drug traffickers, their sentences should be based on the entire weight of mixtures containing a detectable amount of a controlled substance. *See* 21 U.S.C. § 841; U.S.S.G. § 2D1.1(c) note *. Accordingly, the Supreme Court has recently held that, for sentencing purposes, the weight of LSD includes the weight of its carrier medium—in that case, blotter paper. *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 1922, 114 L.Ed.2d 524 (1991). Here, defendant's base offense level was calculated based on the weight of both the cocaine and a creme liqueur in which he had dissolved the cocaine before importing it. Because we see a functional difference between carrier mediums and the creme liqueur, we conclude that the weight of the liqueur should not have been calculated in the base offense level. Accordingly, we reverse.

## BACKGROUND

The facts of this case, while unusual, are not in dispute. On February 25, 1991, after a brief trip to Medellin, Colombia, Elmer Arias Acosta returned to the United States, arriving at John F. Kennedy International Airport aboard Avianca Airways Flight 020. United States Customs Inspectors searched defendant's luggage and no-

ticed six bottles of creme liqueur. Their suspicions aroused because the caps of the bottles appeared to be glued on, the Inspectors seized the bottles, field tested the contents, and determined that the liqueur contained cocaine. The Customs Inspectors then placed defendant under arrest.

The Drug Enforcement Administration subsequently conducted a laboratory analysis and determined that the liquid and cocaine mixture weighed 4.662 kilograms. The government chemist then distilled the cocaine from the liquid and calculated the weight of just the cocaine to be 2.245 kilograms.

On May 29, 1991, defendant pleaded guilty to one count of importing an unspecified amount of cocaine into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), & 960(b)(3). Based on the combined weight of the liquid and cocaine mixture (4.662 kilograms), the Probation Department calculated defendant's base offense level at 30. *See* U.S.S.G. § 2D1.1(c) (Drug Quantity Table). The presentence report stated that both a two-level reduction for acceptance of responsibility and a four-level reduction for "minimal role" were appropriate. Probation thus placed defendant's total offense level at 24, which, when combined with a criminal history category I, resulted in a guideline range of 51–63 months.

At sentencing, defendant objected that the weight of the creme liqueur should not have been included in the weight calculation. He argued that because the cocaine alone weighed 2.245 kilograms, his base offense level should have been 28, rather than 30.[1] *See id.* This two-point reduction would have resulted in a guideline range of 41–51 months. Judge Glasser, with obvious reluctance, rejected defendant's argument, holding that *Chapman* mandated the

---

1. Defense counsel's argument strayed in the direction of a request for a downward departure, the denial of which "is not appealable when the Guidelines provision was correctly applied and the sentence is not in violation of the law." *United States v. Richardson*, 923 F.2d 13, 15 (2d Cir.1991). However, because it is clear that defendant's challenge dealt with the proper ap-

plication of the Guidelines, and was not merely an unsuccessful attempt to obtain a downward departure, we have jurisdiction to entertain this appeal. 18 U.S.C. § 3742(a)(2); *see United States v. Colon*, 884 F.2d 1550, 1552–53 (2d Cir.), *cert. denied*, 493 U.S. 998, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989).

inclusion of the weight of the creme liqueur in the overall weight calculation. Judge Glasser accepted Probation's calculation of the guideline range (51–63 months) and sentenced defendant to 51 months of imprisonment.

Defendant now appeals his sentence.[2]

## DISCUSSION

■ The government concedes that the creme liqueur was merely a mask to conceal the cocaine and that before the cocaine could be distributed, it would have to be distilled out of the liqueur. Similarly, the government does not contest the defendant's argument that the creme liqueur was not ingestible and therefore was not marketable. With that, the issue becomes rather simple: Does the sentencing scheme require that the weight of an unusable portion of a mixture, which makes the drugs uningestible and unmarketable, be included in the overall weight calculation? We think not.

Section 2D1.1 is the applicable guideline for defendants convicted of importing controlled substances. United States Sentencing Guidelines, *Guidelines Manual* (1990) (Appendix A–Statutory Index). This section states that "[u]nless otherwise specified, the weight of a controlled substance set forth in the [Drug Quantity Table] refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1(c) note *. In turn, application note 1 to § 2D1.1 states: " 'Mixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841." This leads us inexorably to *Chapman,* where the Supreme Court focused on the meaning of the term "mixture or substance" in 21 U.S.C. § 841.

In *Chapman,* the defendants were convicted of distributing LSD, dissolved in blotter paper, in violation of 21 U.S.C. § 841(a). The pure LSD weighed approximately 50 milligrams; the combined weight of the LSD and the blotter paper—the carrier medium onto which the LSD had been sprayed—was 5.7 grams. Because the statute required a mandatory minimum sentence of five years for distributing one gram or more of a mixture or substance containing a detectable amount of LSD, *see* 21 U.S.C. § 841(b)(1)(B)(v), the Court had to determine whether Congress intended to include the weight of the carrier medium in the calculation. Examining the legislative history of the statute, as well as the ordinary meaning of the word "mixture", the *Chapman* Court held that "it is the weight of the blotter paper containing LSD, and not the weight of the pure LSD, which determines eligibility for the minimum sentence." *Chapman,* 111 S.Ct. at 1922.

As to legislative history, the Court concluded that Congress had adopted a " 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* at 1925 (citing H.R.Rep. No. 99–845, pt. 1, 11–12, 17 (1986) (*"House Report"*)). This led the *Chapman* Court to write that Congress intended "penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level." *Id.*

Focusing next on the dictionary definition of the word "mixture," the *Chapman* Court stated:

> Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the

**2.** We note that the 51 month sentence imposed falls within the overlap of the two possibly applicable guideline ranges. We have held that when a sentence falls within the overlap and the sentencing judge makes clear that the same sentence would be imposed regardless of which of the two guideline ranges is applicable, we will not engage in the metaphysics of determining which is the appropriate range. *See United States v. Rodriguez,* 928 F.2d 65, 68 n. 1 (2d Cir.1991); *United States v. Bermingham,* 855 F.2d 925, 934 (2d Cir.1988). Here, the record is clear that Judge Glasser would have imposed a sentence less than 51 months had he believed the lower range was applicable, and, therefore, we address defendant's claim of error.

blotter paper ... carrying LSD can be and often is ingested with the drug.

*Id.* at 1926. Rejecting the defendants' due process argument, the *Chapman* Court also noted Congress' rational concern for the amount of drugs that reach the streets, whether pure or impure:

By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity. That is a rational sentencing scheme.

*Id.* at 1927–28.

The *Chapman* Court stressed that its decision would not result in widely divergent sentences for equally culpable defendants because Congress had made clear that those who distribute more of a drug by increasing the amount of dilutants in it are, in fact, more culpable. *See Chapman*, 111 S.Ct. at 1927–28 (citing *House Report* at 12, 17). This is because they are responsible for more of the noxious substance reaching the streets, albeit in diluted form. Purity is not the focal point of culpability; rather, Congress was concerned with the amount of consumable drugs on the market, whether pure or impure. *See Chapman*, 111 S.Ct. at 1927–28; *see also United States v. Rolande–Gabriel*, 938 F.2d 1231, 1237 (11th Cir.1991) ("The entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence.").

The government argues that *Chapman* speaks plainly and directly to the present case and mandates the inclusion of the creme liqueur in the weight calculation. We disagree.

Our starting point is the word "mixture". We note that, in *Chapman*, the LSD and the blotter paper were held to be a mixture because they were commingled and, like cocaine diluted with cutting agents, the LSD and the blotter paper were not easily distinguishable and were both ingestible. *See Chapman*, 111 S.Ct. at 1926. Func-

tionally, i.e., in terms of drug trafficking, the LSD and the blotter paper, like an egg and cheese omelet, became a single product. By contrast, the cocaine/creme liqueur was not an ingestible mixture, and at least one other court has noted that distilling cocaine from liquid waste is not particularly difficult. *See Rolande–Gabriel*, 938 F.2d at 1237 (government chemist easily distilled liquid waste from cocaine). Because the creme liqueur must be separated from the cocaine before the cocaine may be distributed, it is not unreasonable to consider the liquid waste as the functional equivalent of packaging material, *see id.*, which quite clearly is not to be included in the weight calculation. *See Chapman*, 111 S.Ct. at 1926.

Consequently, even though the cocaine/creme liqueur may fall within the dictionary definition of "mixture", the legislative history convinces us that the weight of the creme liqueur must be excluded. Function, not form, is critical. Congress was concerned with mixtures that will eventually reach the streets, i.e., consumable mixtures. *See id.* at 1926, 1927–28 (citing *House Report* at 11–12, 17).

Viewed through a market-oriented prism, there is no difference in culpability between individuals bringing the identical amount and purity of drugs to market but concealing the drugs in different amounts of unusable mixtures. If, for example, A imports two kilograms of pure cocaine mixed in ten kilograms of liqueur, while B smuggles his two kilograms of pure cocaine in twenty kilograms of liqueur, they have both brought the same amount of usable drugs to market, *viz*, two kilograms of cocaine. It defies logic to say that they should be sentenced differently under a statute that was concededly designed to penalize dealers based on the amount of drugs they place on the market. Sentencing these individuals differently would not only ignore Congress' express intent, it would also fly in the face of the fundamental underpinnings of the Guidelines, namely, uniformity and proportionality in sentencing. *See* 28 U.S.C. § 991(b)(1)(B) (Sentencing Commission established to "avoid[ ]

unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); U.S.S.G., Ch. 1, Pt. A, at 1.2 (policy statement) (Congress sought uniformity and proportionality in sentencing); *United States v. Palta,* 880 F.2d 636, 639 (2d Cir. 1989); *Rolande–Gabriel,* 938 F.2d at 1237.

In stark contrast to the LSD in *Chapman,* the "mixture" here was useless because it was not ready for distribution at either the wholesale or the retail level. It could not be ingested or mixed with cutting agents unless and until the cocaine was distilled from the creme liqueur. After distillation, it could be sold at the wholesale level or diluted with cutting agents and sold at the retail level. Only at that point, could Congress' rationale for penalizing a defendant with the entire amount of a "mixture" sensibly apply.

The Eleventh Circuit confronted a remarkably similar situation in *Rolande–Gabriel,* where the defendant pleaded guilty to importing cocaine by concealing it in a liquid. The entire weight of the liquid waste and the cocaine (which had already been mixed with cutting agents) was 241 grams. The weight of the pure cocaine was 7.2 grams, and the cutting agents weighed 65 grams. The Eleventh Circuit held that, while it was proper to base the defendant's sentence on the weight of the usable mixture (the cocaine and the cutting agents), the weight of the unusable liquid should not factor into the sentencing calculus. The *Rolande–Gabriel* court distinguished *Chapman* on the ground that the mixture with the liquid waste was unusable, and concluded that the overriding concern of the Guidelines in promoting rational and uniform sentences required that the liquid waste be excluded from the weight calculation. *See Rolande–Gabriel,* 938 F.2d at 1235–38. The Sixth Circuit has agreed with this conclusion. *See United States v. Jennings,* 945 F.2d 129, 136–37 (6th Cir.1991).

The only other circuit to address this issue post-*Chapman* is the First Circuit. *See United States v. Mahecha–Onofre,* 936 F.2d 623, 625–26 (1st Cir.) (cocaine chemically bonded to acrylic suitcase), *cert. denied,* —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991); *United States v. Restrepo–Contreras,* 942 F.2d 96, 99 (1st Cir. 1991) (cocaine mixed with beeswax), *cert. denied,* —— U.S. ——, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992). In *Mahecha–Onofre,* the defendant argued that because the acrylic to which the cocaine had chemically bonded was not ingestible it should not be included in the weight calculation. Refusing to accept this argument, the First Circuit stated:

> [O]ne reason why Congress and the Sentencing Commission have specified that courts not consider drug "purity" in imposing sentence is that "weight" and "purity" both, roughly speaking, correlate with the seriousness of the crime.

*Mahecha–Onofre,* 936 F.2d at 626.

We do not disagree with this statement. However, we do not believe that it sufficiently disposes of the ingestibility/marketability argument. Congress has made clear that the *weight* of drugs sold at the wholesale or retail level, rather than their *purity,* is the yardstick of culpability. *See Chapman,* 111 S.Ct. at 1927–28 (citing *House Report* at 12, 17). The problem, however, is that, under a market-oriented approach, when the mixture is not ingestible (and therefore not marketable), there is no reason to base a sentence on the entire weight of a useless mixture. The issue here is marketability, not purity. This distinction was highlighted by the Eleventh Circuit when it held that the sentence was to be based on the amount of the usable mixture—not the pure cocaine, but the cocaine mixed with the ingestible cutting agents. *See Rolande–Gabriel,* 938 F.2d at 1237. For this reason, we are constrained to disagree with the First Circuit.[3]

---

**3.** Several pre-*Chapman* decisions are arguably, but not necessarily, contrary to the result we reach today. *See, e.g., United States v. Garcia,* 925 F.2d 170 (7th Cir.1991); *United States v. Berry,* 876 F.2d 55 (8th Cir.1989); *United States*

*v. Yu–Chong,* 920 F.2d 594 (9th Cir.1990). In *Garcia,* the Seventh Circuit stated that it was rejecting the defendant's claim that the weight of the moisture in the seized marijuana should not be included because it made the marijuana

The government highlights certain language in *Chapman* where the Court stated that blotter paper "facilitate[s] the distribution of the drug. Blotter paper makes LSD easier to transport, store, conceal, and sell." *Chapman*, 111 S.Ct. at 1928. The Court also referred to blotter paper as a "tool of the trade for those who traffic in [LSD]." *Id.* Building on these passages, the government argues that defendant should be charged with the weight of the creme liqueur because it was his chosen tool of the importation trade. We are not persuaded by this argument.

■ True, creme liqueur, like blotter paper, may be used to transport and conceal drugs. The distinction, however, is that, unlike creme liqueur, the blotter paper, or some other carrier medium, is *necessary* to the distribution and consumption of LSD. LSD must be placed on a carrier medium to reach the market. That is not true of cocaine. Creme liqueur is merely a device to mask cocaine while it is being transported. The government's argument that because creme liqueur may be used to transport and conceal cocaine the liqueur must therefore be weighed for sentencing purposes ignores the Guidelines' touchstone for measuring culpability in drug trafficking cases—the amount of the commodity, i.e., consumable or marketable drugs, that the defendant moves in the chain of distribution. Put another way, it is not *how* one traffics in the commodity (in this case mixing it with six, as opposed to sixteen or twenty-six, etc., bottles of liqueur) that is important but, rather, *how much* of the commodity one transports or distributes that is relevant in calculating the weight of a controlled substance for sentencing purposes.

■ The government also seeks to avoid *Chapman*'s discussion of Congress' market-oriented approach by arguing that this is an *importation* case (21 U.S.C. §§ 952 & 960), whereas *Chapman* was a *distribution* case (21 U.S.C. § 841). This is unpersuasive. The Guidelines provide that, for purposes of calculating weight, the phrase "mixture or substance" should be given the same meaning it has in 21 U.S.C. § 841. *See* U.S.S.G. § 2D1.1 App. Note 1. The congressional intent underlying § 841—as defined in *Chapman*—is clear and unavoidable. The government cannot have it both ways; the Sentencing Commission directs us to § 841 to define "mixture or substance," and we therefore follow *Chapman*'s interpretation.

Furthermore, we do not believe that there is a valid conceptual distinction between drugs in the importation market and drugs in the distribution market. Even in the importation market, drugs must be distilled *from uningestible mixtures to be sent* down the chain of distribution.

## CONCLUSION

We emphasize the limited nature of our holding. The government concedes that the creme liqueur is not a cutting agent or dilutant which, when mixed with cocaine, is ingestible. Cutting agents, of course, must always be factored into the weight calculation. So long as the mixture is ingestible, it is marketable. However, proper administration of the Guidelines, in light of Congress' market-oriented approach, mandates that a defendant's culpability be based on

unmarketable. The *Garcia* court, however, specifically noted that moisture is arguably included in the definition of the drug and stated that *Garcia*'s marketability theory was particularly suspect because damp marijuana is not necessarily unmarketable. *See Garcia*, 925 F.2d at 172, 173 n. 1. In *Berry*, the Eighth Circuit held that marijuana stalks must be considered in the weight calculation, but never indicated whether the stalks made the marijuana unusable. *See Berry*, 876 F.2d at 56. In fact, as to marijuana, Congress has specifically noted that all parts of a marijuana plant are to be considered in the weight calculation; and one likely reason for

this is that all parts of the plant may be granulated and sold. *See United States v. Lewis*, 762 F.Supp. 1314, 1315–18 (E.D.Tenn.), *aff'd*, 951 F.2d 350 (6th Cir.1991). Finally, in *Yu–Chong*, the Ninth Circuit rejected the defendants' claim that certain heroin additives should be excluded from the weight calculation. In dispatching this argument, the Ninth Circuit explicitly stated that defendants had failed to show "that the substance sold was without substantial value, or that it was *not consumable* by the ultimate user." *Yu–Chong*, 920 F.2d at 598 (emphasis added).

the amount of *usable* drugs that he brings to market, whether he operates on the wholesale, retail, or, as here, the importation market. Because the creme liqueur/cocaine is not an ingestible mixture, we hold that it was improper to include the weight of the creme liqueur in the weight calculation.

REVERSED AND REMANDED.

VAN GRAAFEILAND, Circuit Judge, dissenting:

My colleagues' entry into the field of judicial legislation undoubtedly will elicit huzzahs from those who traffic in illegal narcotics. However, I cannot join in this applause. With all due respect, I suggest that my colleagues have rejected universally accepted rules of statutory construction and, in the process, have arrived at a result that is both legally and factually wrong. I therefore dissent.

At the outset, I must take issue with my colleagues' statements concerning alleged Government concessions. The Government did not, and could not, concede that before the cocaine could be "distributed" it would have to be distilled out of the liqueur. According to the statement of facts contained in Acosta's own brief, "[h]e was paid a certain amount of money to carry the contraband past U.S. Customs and then deliver it to a location where he would be relieved of it by the real owners." Br. at 4. This would be "distribution" under the statute. "The term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11). "The terms 'deliver' or 'delivery' mean the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8); *see United States v. Workopich*, 479 F.2d 1142, 1147 (5th Cir.1973). Had Acosta not been arrested with the liqueur and cocaine in his possession, he would have "distributed" it to the "real owners." It is, of course, no defense that he might have been acting as the owners' agent in smuggling the mixture through customs. *See United States v. Swiderski*, 548 F.2d 445, 450–51 (2d Cir. 1977). "The agent who delivers to his principal performs a service in increasing the distribution of narcotics." *Id.* at 451. Acosta falls squarely within the " 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991).

My colleagues erroneously interpret the phrase "market-oriented approach" by emphasizing the final act of distribution. Prior to the enactment of the Comprehensive Drug Abuse Prevention and Control Act of 1970, a participant in an illegal drug transaction had to be punished as either a seller or a buyer. *See United States v. Pruitt*, 487 F.2d 1241, 1245 (8th Cir.1973) (quoting *United States v. Moses*, 220 F.2d 166, 168 (3d Cir.1955)). However, Congress, recognizing the well-known fact that narcotics such as cocaine often pass through at least five or six hands before reaching the ultimate purchaser, opted to view the transaction as a whole and to illegalize participation in all of its stages. As the Ninth Circuit sitting en banc in *United States v. Palafox*, 764 F.2d 558, 560 (9th Cir.1985), said: "Our examination of the statute and its history underscores the strong congressional intent to criminalize all aspects of drug trafficking, and it compels us to reject an approach which focuses on sales or commercial transactions." Thus, any person who participates in any phase of the transaction from start to finish is punishable under the Act. *Id.*; *see United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); *United States v. Wigley*, 627 F.2d 224, 226 (10th Cir.1980). See also the following excerpt from a report of the House Judiciary Committee, H.R.Rep. No. 99–845, 99th Cong., 2d Sess. 12 (1986), as quoted in *United States v. Bishop*, 894 F.2d 981, 986 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 77 (1990):

> After consulting with a number of DEA agents and prosecutors about the distri-

butions patterns for these various drugs, the Committee selected quantities of drugs which if possessed by an individual would likely be indicative of operating at such a high level. The Committee's statement of quantities is of mixtures, compounds or preparations that contain a detectable amount of the drug—these are not necessarily quantities of pure substance. One result of this market-oriented approach is that the Committee has not generally related these quantities to the number of doses of the drug that might be present in a given sample. The quantity is based on the minimum quantity that might be controlled or directed by a trafficker in a high place in the processing and distribution chain. (Emphasis omitted)

Assuming for the sake of argument only that my colleagues' interpretation of "distribution" is correct, their application of that term, even as they define it, to the facts of the instant case is not correct. Acosta pled guilty to violating 21 U.S.C. § 952(a) by importing cocaine into the United States. He did not admit to possessing cocaine with intent to distribute, which is a separate and distinct offense, *see United States v. Ramirez–Amaya*, 812 F.2d 813, 817 (2d Cir.1987). Acosta's violation of section 952(a) was complete when he brought the cocaine into the country. *See United States v. Muench*, 694 F.2d 28, 32 (2d Cir. 1982), *cert. denied*, 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983); *United States v. Pentapati*, 484 F.2d 450, 451 (5th Cir. 1973). As Judge McLaughlin himself said on another occasion:

> Section 952(a) of the Act defines the crime. The entry of controlled substances onto American soil causes the harm and furnishes the jurisdictional basis for punishment of the offender.

*United States v. Londono–Villa*, 930 F.2d 994, 1001–02 (2d Cir.1991) (McLaughlin, J., dissenting). My colleagues' discussion of the marketability and distributability of the mixture that Acosta imported is not only wrong on the merits, it is irrelevant. Section 2D1.1 of the Guidelines under which Acosta was sentenced applies to unlawful "importing" as well as other forms of trafficking.

My colleagues' assertion that the Government "does not contest the defendant's argument that the creme liqueur was not ingestible" also is wide of the mark. Defendant-appellant's brief contains no mention whatever of lack of ingestibility. To the extent that there was any argument against ingestibility, it was my colleagues, not appellant's counsel, who made it, and a poor argument it was. Although 21 U.S.C. § 802(17) defines "[a]ny compound, mixture, or preparation which contains any quantity of [cocaine]" as a "narcotic drug", cocaine was not always treated so harshly in either the courts of law or of public opinion. Indeed, during the latter half of the nineteenth century, cocaine appears to have received more praise than condemnation. Because cocaine was readily soluble, it became an ingredient in many patent medicines. It also was added to wines, cordials and soft drinks, because it increased their exhilarative properties. A famous mixture of wine and cocaine, called Vin Mariani, is said to have received the endorsement of such notables as Charles Gounod, John Phillips Sousa, Thomas Edison, Sarah Bernhart, Jules Verne, and Pope Leo XIII. *See* Gerald McLaughlin, *Cocaine: The History and Regulation of a Dangerous Drug*, 58 Cornell L.Rev. 537, 545–46 (1973); Chris–Ellyn Johanson, *Cocaine: A New Epidemic*, at 56, published as part of The Encyclopedia of Psychoactive Drugs (1986); Steven Wisotsky, *Exposing the War on Cocaine: The Futility and Destructiveness of Prohibition*, 1983 Wis.L.Rev. 1305, 1311 n. 34. Another liqueur mixture called Coca Cordial was widely sold. Wisotsky, *supra*, at 1311. As might be surmised from its name, the soft drink Coca Cola, as originally concocted, also contained cocaine. Johanson, *supra*, at 56. In short, my colleagues' assertion that cocaine dissolved in a liqueur is not ingestible, and that the correctness of this assertion is not contested, is wrong.[1]

---

1. A bottle of Acosta's imported elixir poured into the punchbowl would add life to any party.

Having misstated the ingestibility of the bottled matter that Acosta imported, my colleagues compound their error by misinterpreting the words "mixture" and "substance" as used in Guideline 2D1.1:

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectible amount of the controlled substance.

Contrary to my colleagues' contention, these words have the same meaning in 21 U.S.C. § 841, i.e., their ordinary meaning. In *United States v. Marshall*, 908 F.2d 1312, 1317 (7th Cir.1990), *aff'd sub nom. Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the court said:

> It is not possible to construe the words of § 841 to make the penalty turn on the net weight of the drug rather than the gross weight of carrier and drug. The statute speaks of "mixture or substance containing a detectable amount" of a drug. "Detectable amount" is the opposite of "pure"; the point of the statute is that the "mixture" is not to be converted to an equivalent amount of pure drug.

The Supreme Court agreed:

> Neither the statute nor the Sentencing Guidelines define the terms "mixture" and "substance," nor do they have any established common law meaning. Those terms, therefore, must be given their ordinary meaning. See *Moskal v. United States*, 498 U.S. ——, —— [111 S.Ct. 461, 468–70, 112 L.Ed.2d 449] (1990). A "mixture" is defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster's Third New International Dictionary 1449 (1986). A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of

the other. 9 Oxford English Dictionary 921 (2d ed. 1989).

> . . . .

> ... The statutory language and structure indicate that the weight of a carrier should be included as a "mixture or substance containing a detectable amount" of LSD when determining the sentence for an LSD distributor.

111 S.Ct. at 1925–26.

Prior to *Chapman*, a number of lower courts found the terms "mixture" and "substance" to be plain, clear and unambiguous. *See, e.g., United States v. Bishop*, 894 F.2d 981, 985 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 77 (1990); *United States v. Daly*, 883 F.2d 313, 317 (4th Cir.1989), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990); *United States v. Rojas*, 868 F.2d 1409 (5th Cir.1989); *United States v. Smith*, 840 F.2d 886, 889 & n. 2 (11th Cir.), *cert. denied*, 488 U.S. 859, 109 S.Ct. 154, 102 L.Ed.2d 125 (1988). *Chapman* therefore simply confirmed what these courts already had held, i.e., that, for sentencing purposes, "the weight of a carrier should be included as a 'mixture or substance containing a detectable amount' of [the controlled substance]." 111 S.Ct. at 1926.

Neither *Chapman* nor the Act limits the meaning of the words "mixture" or "substance" to matters that are ingestible. Congress primarily was after the big-time trafficker in drugs[2] and adjusted the statutory penalties according to the manner in which he, rather than the small-time street distributor, packaged and disposed of his product. Thus, it is largely irrelevant whether the substance or mixture that the big-time operator starts or moves along the chain of distribution is ingestible. Ingestibility has significance, if at all, only with respect to the last act of distribution, i.e., the sale to the consumer. Reading the unexpressed limitation of ingestibility into the statute generally would lead to results that Congress clearly did not intend. For

---

Indeed, one could host a fairly gay soiree by adding only the liqueur, which my colleagues call "liquid waste."

2. This is quite obvious from the drug quantities contained in the sentencing guidelines.

example, *Chapman* involved a mixture of LSD and a rapidly evaporating solvent such as alcohol. Either the solution was sprayed onto blotters or blotters were dipped into the solution. 111 S.Ct. at 1923. Under my colleagues' interpretation of the statute, if the solution had been seized before the spraying or dipping occurred, the weight of the mixture could not have been used as the basis for sentencing. This just doesn't make sense. As the Supreme Court stated in *Chapman*, Congress was justified in seeking to avoid arguments about the amount of pure drugs extracted from a mixture. 111 S.Ct. at 1928. A much more sensible answer was given by the Eighth Circuit in *United States v. Brown*, 921 F.2d 785 (8th Cir.1990), where the seized drug, PCP (phencyclidine), was in a mouthwash bottle, mixed with liquid ether. The proof in that case was that cigarettes would be dipped into the solution, dried and sold. Although liquid ether obviously is not an ingestible substance, the court used the entire weight of the ether mixture in imposing sentence. If my colleagues' interpretation of the terms "mixture" and "substance" is adopted, the Government will be required to extract the pure drug from every non-ingestible mixture in order to charge a knowledgable offense. Congress avoided arguments concerning the purity and weight of the drug thus extracted by permitting the total mixture to be weighed.

My colleagues' contention that adherence to the plain and ordinary meaning of the words "mixture" and "substance" would result in a lack of uniformity and proportionality in sentencing was rejected by the Supreme Court in *Chapman, supra*, 111 S.Ct. at 1927–29. Moreover, this argument has been rejected so often by so many courts as to have become almost threadbare. *See, e.g., United States v. Bishop, supra*, 894 F.2d at 985–96; *United States v. Klein*, 860 F.2d 1489, 1500–01 (9th Cir. 1988); *United States v. Whitehead*, 849 F.2d 849, 859–60 (4th Cir.), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); *United States v. Holmes*, 838 F.2d 1175, 1177–78 (11th Cir.), *cert. denied*, 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988).

The Second Circuit has not yet considered the issue of disproportionality and lack of uniformity with respect to the federal statute. It has, however, considered it with respect to former section 220.23 of New York's Penal Law, which made it a crime to knowingly possess "a narcotic drug consisting of one or more preparations, compounds, mixtures or substances of an aggregate weight of sixteen ounces or more of ... cocaine...." In *People v. Daneff*, 30 N.Y.2d 793, 334 N.Y.S.2d 897, 286 N.E.2d 273 (1972) (mem.), *cert. denied*, 410 U.S. 913, 93 S.Ct. 977, 35 L.Ed.2d 276 (1973), the appellant had challenged the statute because "the standard provided for determining the degree of the crime was the quantity or weight of the mixture or compound containing the narcotic [cocaine] rather than the quantity or weight of the actual narcotic content of the mixture or compound." *Id.* (summary headnote). After this challenge was rejected by the New York Court of Appeals and certiorari was denied by the Supreme Court, Daneff petitioned for habeas corpus relief in the Southern District of New York. In affirming the district court's dismissal of the petition, we said that, in view of the fact that cocaine generally is marketed in mixtures or compounds, "it does not seem unreasonable or irrational for a legislature to deal realistically with the marketing of the mixture or compound rather than the handling of the pure narcotic." *United States ex rel. Daneff v. Henderson*, 501 F.2d 1180, 1184 (2d Cir.1974). We said further that "[t]he State cannot be expected to make gradations and differentiations and draw distinctions and degrees so fine as to treat all law violators with the precision of a computer...." *Id.* New York has adhered to the ruling of its Court of Appeals in *Daneff, see People v. LaPorta*, 56 A.D.2d 983, 393 N.Y.S.2d 118 (1977) (mem.), and we have adhered to our ruling on the habeas corpus petition, *see Carmona v. Ward*, 576 F.2d 405, 408 n. 4 (2d Cir.1978), *cert. denied*, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 58 (1979). Many other states with

similar statutes have reasoned in similar fashion.[3]

Most of the above-cited decisions, both state and federal, recognize the possibility of hypothesizing rare and unusual situations in which the statutes involved might become seemingly unfair in application. However, "this sort of attack on a criminal statute must be made on a case-by-case basis." *Schall v. Martin,* 467 U.S. 253, 269 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984). Assuming that Acosta has standing to argue the possibility of such unusual applications, *but see United States v. Kidder,* 869 F.2d 1328, 1335 (9th Cir. 1989), we "do not require that the means chosen by Congress to deal with a problem score a notable success in every application of the statute." *United States v. Agilar,* 779 F.2d 123, 125 (2d Cir.1985), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1385, 89 L.Ed.2d 609 (1986).

While Congress is continually increasing its efforts to halt drug smuggling into the United States, *see, e.g.,* National Drug Interdiction Improvement Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, this court should not point its efforts in the opposite direction. We can avoid doing this in the instant case if we simply heed the following admonition of Justice O'Connor writing for the Court in *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985):

> Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. *Garcia v. United States,* 469 U.S. 70, 75 [,105 S.Ct. 479, 482–83, 83 L.Ed.2d 472] (1984); *United States v. Turkette,* 452 U.S. 576, 580 [,101 S.Ct. 2524, 2527, 69 L.Ed.2d 246] (1981). "[O]nly the most extraordinary showing of contrary intentions" in the legislative history will justify a departure from that language. *Garcia, supra,* [469 U.S.] at 75 [,105 S.Ct. at 482]. Any other conclusion,

while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution. *United States v. Locke,* 471 U.S. 84, 95–96 [,105 S.Ct. 1785, 1792–94, 85 L.Ed.2d 64] (1985). Proper respect for those powers implies that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194 [,105 S.Ct. 658, 661, 83 L.Ed.2d 582] (1985).

Because my colleagues have exceeded their authority by judicially legislating and have committed substantial error and created unnecessary confusion in the process, I respectfully dissent.

---

**3.** *See Velunza v. State,* 504 So.2d 780, 781 n. 1 (Fla.Dist.Ct.App.1987); *State v. Perry,* 316 N.C. 87, 340 S.E.2d 450, 459–60 (1986); *Lawhorn v. State,* 452 N.E.2d 915, 917–18 (Ind.1983); *Commonwealth v. Beverly,* 389 Mass. 866, 452 N.E.2d 1112, 1114–15 (1983); *Traylor v. State,* 458 A.2d 1170, 1176–77 (Del.1983); *Lavelle v. State,* 250 Ga. 224, 297 S.E.2d 234, 235–36 (1982); *People v. Lemble,* 103 Mich.App. 220, 303 N.W.2d 191, 192–93 (1981); *People v. Mayberry,* 63 Ill.2d 1, 345 N.E.2d 97, 101, *cert. denied,* 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976).