# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARREN WIGGINS, | § | |
| | § | No. 46, 2019 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 1802014575 (N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 8, 2020
Decided: April 7, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED.**

Nicole M. Walker, Esquire, (*argued*) Office of the Public Defender, Wilmington, Delaware, *for Defendant-Appellant Darren Wiggins*.

Matthew C. Bloom, Esquire, (*argued*) Department of Justice, Wilmington, Delaware, *for Plaintiff-Appellee State of Delaware*.

**MONTGOMERY-REEVES**, Justice, for the Majority:

The facts, for the purposes of this appeal, are not in dispute. On February 22, 2018, Appellant Darren Wiggins was arrested. He had in his possession a vial containing an amber liquid with brown chunks suspended in the liquid. The State's chemist tested the amber liquid, which tested positive for phencyclidine ("PCP"); she did not test or otherwise identify the brown chunks. The chemist also weighed the liquid PCP and brown chunks together and determined that they weighed 17.651 grams. The chemist did not weigh the liquid or the brown chunks separately. At trial, the State presented no evidence regarding the nature of the brown chunks or their relation to the liquid PCP other than their co-location within the same vial. Nonetheless, the jury found Wiggins guilty of Aggravated Possession of PCP under Delaware's Uniform Controlled Substances Act.

The General Assembly has adopted a statutory scheme that criminalizes drug possession in tiers. Possession of greater amounts of controlled substances results in steeper penalties regardless of the drugs' purity. At issue here, possession of 15 grams or more of PCP, or of any mixture containing any such substance, is classified as a Class B Felony and carries a minimum sentence of two years at Level V incarceration.

The parties' sole focus in this appeal is on whether a rational jury could have concluded that the State met its burden to prove that the liquid PCP and brown

2

chunks in Wiggins's vial constituted a "mixture" under the statutory scheme. Both parties point to federal precedent, arguing opposing sides of a federal circuit split to support competing interpretations of "mixture." Wiggins argues that this Court should follow the majority of federal circuits and hold that "mixtures" include only the weight of marketable or usable drug compounds. The State, emphasizing the minority viewpoint, argues that dictionary definitions are dispositive of "mixture's" plain meaning; and under the dictionary definitions, the weight of all components with the controlled substances should be included.

After considering the text of the statute and this Court's precedent, we hold that the meaning of "mixture" within Delaware's statutory scheme requires a showing that the mixture is marketable or usable. As the State presented no evidence concerning what the brown chunks were, that they were in any way associated with liquid PCP, or that they were conventionally sold or used with PCP mixtures, the State made no showing that the liquid PCP and unidentified brown chunks were a marketable or usable drug mixture. Therefore, we vacate the conviction for Aggravated Possession of PCP and remand for sentencing for the lesser-included offense of Misdemeanor Possession of PCP.

## I.   BACKGROUND

On February 22, 2018, police arrested Darren Wiggins during a routine traffic stop after discovering outstanding warrants.[1]  Police conducted a search incident to arrest and found a glass vial on Wiggins's person that the officers suspected contained PCP.[2]  The officers took Wiggins into custody and sent the vial to the Delaware State Forensic Laboratory for testing.[3]

Heather Moody, a forensic chemist at the Division of Forensic Science, examined the vial and reported that it contained "amber liquid with brown chunks" floating in it.[4]  Moody tested a sample of the amber liquid and confirmed it was PCP.[5]  Moody did not, however, test a sample of the brown chunks that were floating in the vial,[6] and she did not know what the brown chunks were.[7]  Moody also weighed the vial's contents.  Together, the amber liquid and the brown chunks weighed a total of 17.651 grams.[8]  Moody never weighed the liquid and the brown chunks separately.[9]

---

[1] App. to Opening Br. A13-16 ("A__" hereafter).
[2] A14.  Police also found other drugs during their search of Wiggins that are not the subject of this appeal. *Id.*
[3] A20.
[4] A20-24.
[5] *Id.*
[6] *Id.*
[7] A24.
[8] A23.
[9] *Id.*

The State charged Wiggins with four counts in connection with the February 22, 2018 arrest: two counts of Illegal Possession of a Controlled Substance; one count of Possession of Marijuana; and one count of Aggravated Possession of PCP.[10] Wiggins's one-day trial took place on September 5, 2018.[11] After the prosecution rested, Wiggins moved for a judgment of acquittal as to the Aggravated Possession charge, arguing that the State failed to prove that the PCP mixture met the 15-gram statutory weight threshold.[12] Because the State did not separately weigh or test the brown chunks, it presented no evidence that those chunks were part of the PCP mixture except that they were in the same vial as the liquid PCP.[13]

The Superior Court denied Wiggins's Motion, and the jury convicted Wiggins of all charges, including the charge of Tier 3 Aggravated Possession of PCP.[14] Wiggins now appeals the trial judge's denial of his motion for judgment of acquittal, arguing that the State presented insufficient evidence to establish that Wiggins was guilty of Tier 3 Aggravated Possession.

## II. STANDARD OF REVIEW

This Court "review[s] the denial of a motion for judgment of acquittal *de novo* to determine whether any rational trier of fact, viewing the evidence in the light most

---

[10] A7-8.
[11] A9.
[12] A26-28.
[13] *Id.*
[14] A28, 40.

favorable to the State, could find the defendant guilty beyond a reasonable doubt."[15]

## III. ANALYSIS

Wiggins appeals the Superior Court's denial of his motion for judgment of acquittal and argues that no rational jury could find that the State proved, beyond a reasonable doubt, the 15-gram weight threshold for Tier 3 Aggravated Possession.

Wiggins argues that the brown chunks were not part of the mixture containing PCP because they were easily separated from the liquid PCP, visually and physically distinct, not diffused throughout the liquid PCP, and not used to dilute the substance or facilitate distribution.[16] Wiggins adds that because the State did not test the brown chunks, the jury had no way of knowing whether they had to be removed before using the PCP.[17] Because the chunks were not part of the mixture, and there was no evidence that the chunks were PCP, Wiggins argues that the weight should not have included the brown chunks, and as a result, the State failed to prove the threshold weight.

The State responds that it presented "sufficient evidence at trial to convict Wiggins of aggravated possession of PCP."[18] It contends that the liquid PCP and brown chunks constituted a mixture under the word's plain meaning as determined

---

[15] *Pardo v. State*, 160 A.3d 1136, 1149–50 (Del. 2017) (internal quotation marks and citation omitted).
[16] Opening Br. 15.
[17] *Id.* at 14.
[18] Answering Br. 3.

6

by dictionary definitions. The State argues that it was unnecessary to present evidence concerning the nature of the brown chunks because the jury could find that the vial's contents were a mixture based on the presence of both the PCP and brown chunks within the same vial.

Thus, this case turns on the meaning of "mixture."

## A. Defining "Mixture" in Delaware's Uniform Controlled Substances Act

Delaware's Uniform Controlled Substances Act (the "Act") imposes harsher sentences based on the weight of the controlled substance in an offender's possession. At the time of Wiggins's arrest, the relevant Aggravated Possession provision within the Act stated that "any person who . . . [p]ossesses a controlled substance in a Tier 3 quantity . . . shall be guilty of a class B felony."[19] A separate provision defined a Tier 3 controlled substance quantity as "15 grams or more of phencyclidine [PCP], or of any mixture containing any such substance."[20]

When interpreting a statute, the Court must first "determine whether the statute is ambiguous, because if it is not, then 'the plain meaning of the statutory language controls.' The fact that the parties disagree about the meaning of the statute does not create ambiguity."[21] Instead, "[i]f a statute is reasonably susceptible of

---

[19] 16 *Del. C.* § 4752(4), *amended by* 82 Del. Laws ch. 217, § 6 (2019).
[20] 16 *Del. C.* § 4751C(3)(f), *amended by* 82 Del. Laws ch. 217, § 4 (2019).
[21] *Chase Alexa, LLC v. Kent Cty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010) (citations omitted).

different conclusions or interpretations, it is ambiguous."[22]  When an unambiguous statute contains words or phrases that are undefined, those "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language."[23]

This Court has held that previous versions of Delaware's Aggravated Possession provision were unambiguous.  In *Lloyd v. State*, this Court interpreted a statute that made possession of "15 grams or more of methamphetamine . . . or of any mixture containing any such substance" a felony.[24]  This Court held that the statute was not open to multiple interpretations; instead, it unambiguously criminalized the possession of a "mixture" including methamphetamine.[25] Likewise, in *Shy v. State*, this Court held that a statute criminalizing the possession of "8 grams or more of any morphine, opium or any salt, isomer or salt of an isomer thereof, including heroin . . . or 8 grams or more of any mixture containing any such substance," was unambiguous.[26]

---

[22] *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) (citations omitted).
[23] 1 *Del. C.* § 303; *see also Coastal Barge Corp.*, 492 A.2d at 1245 ("A statute is passed by the General Assembly as a whole and not in parts or sections.  Consequently, each part or section should be read in light of every other part or section to produce an [sic] harmonious whole.").
[24] 534 A.2d 1262, 1266 (Del. 1987) (emphasis removed).
[25] *Id.*
[26] 459 A.2d 123, 125 (Del. 1983).

8

The Aggravated Possession provision at issue here mirrors the language and structure of the provisions at issue in *Lloyd* and *Shy*; thus, it also is unambiguous. Yet, despite the Aggravated Possession provision's unambiguous nature, it does not specifically define "mixture." Therefore, we assign "mixture" its common and ordinary meaning in the context of the Act.[27]

### 1. The United States Supreme Court's holding in *Chapman*

To determine the common meaning of "mixture" in the Act, both parties point to the United States Supreme Court's decision in *Chapman v. United States*, which interpreted the meaning of "mixture" under a similar federal aggravated possession statute.[28] In *Chapman*, the Court considered whether liquid LSD and the blotter paper on which it was applied were a "mixture" for the purpose of weight for sentencing.[29] The federal sentencing guidelines assigned steeper penalties for possession depending on the weight of a "mixture or substance containing a detectable amount" of LSD.[30] Because the federal statute did not define "mixture," the Court relied on its ordinary meaning derived from dictionaries.[31] The Court also

---

[27] 16 *Del. C.* § 4701; 1 *Del. C.* § 303; *see also Pennewell v. State*, 977 A.2d 800, 801 (Del. 2009).
[28] 500 U.S. 453 (1991).
[29] *Id.* at 453-54.
[30] *Id.* at 461.
[31] *Id.* at 462 ("A 'mixture' is defined to include 'a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence.' Webster's Third New International Dictionary 1449 (1986). A 'mixture' may also consist of two substances

9

noted in *Chapman* that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence."[32] The Court reasoned that "Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going."[33]

The Court then applied that statutory context to analyze the LSD and blotter paper. It held that "[a]lthough LSD is not sold by weight, but by dose, and a carrier medium is not, strictly speaking, used to 'dilute' the drug, that medium [the blotter paper] is used to facilitate the distribution of the drug."[34] Further, the LSD was "diffused among the fibers" of the blotter paper, not distinguishable or easily separated from the paper, and "[l]ike cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug."[35] The Court also distinguished the blotter paper from packaging materials and containers like glass vials, which would not be considered part of a mixture.[36]

---

blended together so that the particles of one are diffused among the particles of the other. 9 Oxford English Dictionary 921 (2d ed. 1989).").

[32] *Id.* at 461.

[33] *Id.*

[34] *Id.* at 466.

[35] *Id.* at 462.

[36] *Id.* at 462-63.

Therefore, because the blotter paper "medium [was] used to facilitate the distribution of the drug" and acted as a "tool of the trade for those who traffic in [LSD]," the United States Supreme Court held that the LSD and the blotter paper were a mixture and included the weight of the blotter paper for sentencing.[37]

### 2. The Federal Circuit split

After *Chapman*, federal circuits split over the decision's application to other potential mixtures. The majority of circuits that have considered this issue[38] determine whether a component is part of a mixture based on whether the compound remains "usable in the chain of distribution" after the component is included.[39]

For example, the Third Circuit considered the effects of *Chapman* in *United States v. Rodriguez*, where defendants sold brick-like packages consisting of 65.1

---

[37] *Id.* at 458, 462.

[38] *See United States v. Killion*, 7 F.3d 927, 932 (10th Cir. 1993) (assessing the circuit split and noting that the "Second, Third, Sixth, Seventh, Ninth, and Eleventh Circuits have adopted the approach that sentencing calculations . . . may not be based on the weight of mixtures containing unusable, unmarketable materials"); *United States v. Acosta*, 963 F.2d 551, 554, 556 (2d Cir. 1992) (excluding the weight of crème liqueur which contained dissolved cocaine from the weight for sentencing because it was not ingestible, unmarketable, and functionally equivalent to packaging material); *United States v. Robins*, 967 F.2d 1387, 1389 (9th Cir. 1992) (excluding cornmeal masked by cocaine because they were easily distinguished by their colors, cornmeal was not a tool of the trade, not used to facilitate or cut the cocaine, had to be separated before using the cocaine, and the cornmeal was the "functional equivalent of packaging material"); *United States v. Jennings*, 945 F.2d 129, 137 (6th Cir. 1991) (excluding the toxic byproduct of methamphetamine found in a crockpot containing the methamphetamine because the defendants could only sell or distribute the amount of methamphetamine eventually distilled from the crockpot); *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1237 (11th Cir. 1991) (excluding liquid waste mixed with cocaine because it did not facilitate the use, marketing and access to cocaine).

[39] *Rolande-Gabriel*, 938 F.2d at 1237.

grams of cocaine and 2,976 grams of boric acid.[40]  The brick packages had a thin layer of cocaine on top of the boric acid and were "constructed in an effort to fool an unsuspecting customer—in this case a federal drug agent—into thinking that they were comprised wholly of cocaine."[41]  The trial court considered the entire weight of the cocaine and boric acid for sentencing, and the Third Circuit reversed.

The Third Circuit reasoned that unlike the LSD and blotter paper in *Chapman*, the cocaine and boric acid compound in *Rodriguez* "was not the ordinary drug product moving in the stream of commerce in the manner envisioned by Congress."[42]  Instead, the boric acid was visibly distinguishable from the cocaine, easily separated from the rest of the compound, not routinely used in cocaine distribution, and not "intended to be used as a cutting agent."[43]  Moreover, "the proportion of cocaine to boric acid in the whole mass, if mixed, would render the resulting product unsalable and unusable—and probably even toxic."[44]  Thus, the Third Circuit held that the boric acid rendered the compound unusable and "that the defendants should have been sentenced based on the 65.1 grams of usable cocaine that had been mixed with a cutting agent."[45]

---

[40] 975 F.2d 999, 1001 (3d Cir. 1992).
[41] *Id.*
[42] *Id.* at 1005.
[43] *Id.*
[44] *Id.* at 1006.
[45] *Id.* at 1007.

Other circuit courts reject the majority approach and include the additional weight of components even when those components render the drug compound unusable.[46] For instance, in *United States v. Walker*, the Fifth Circuit held that "the district court correctly used the entire weight of a mixture or substance containing a detectable amount of methamphetamine" even though the majority of that mixture consisted of toxic chemical byproduct.[47] There, the police seized the defendant's crockpot, which was being used to "cook" methamphetamine and held "a quantity of a toxic liquid substance . . . and a small percentage of methamphetamine."[48] Since the toxic byproduct and methamphetamine were found in the same crockpot, the Fifth Circuit held that the contents of that crockpot were one "mixture" regardless of the compound's usability.[49]

Thus, while most circuits only consider the weight of useable drug compounds for sentencing, the minority of courts include the weight of additional unusable components. As the Supreme Court has not resolved the circuit split following

---

[46] *See Killion*, 7 F.3d at 933-34 (noting that the First, Fifth, and Tenth Circuits do not consider the marketability of a drug substance "provided, of course, that the mixture or substance contains a detectable amount of the controlled substance in question"); *United States v. Mahecha–Onofre,* 936 F.2d 623 (1st Cir. 1991) (entire weight of suitcases composed of cocaine bonded chemically with acrylic suitcase material minus all metal parts was includable for sentencing purposes, reasoning that "ingestion" would not seem to play a critical role in the definition of "mixture or substance").

[47] 960 F.2d 409, 412 (5th Cir. 1992).

[48] *Id.* at 413.

[49] *Id.*

*Chapman*, the parties advocate the reasoning of opposite sides of the federal split.[50]

Wiggins argues that the approach adopted by the majority of federal circuits correctly captures the meaning of "mixture" in the Delaware statute.[51] The State responds that minority circuit jurisdictions are more faithful to the dictionary definitions of "mixture" and that this Court's precedents directly conflict with the majority approach.[52]

## B. Delaware's Aggravated Possession Statute

In *Traylor v. State*, this Court acknowledged that the General Assembly intentionally adopted a "market-oriented" sentencing scheme—similar to the federal scheme in *Chapman*—that imposes steeper penalties for introducing higher quantities of drugs into the market, regardless of the purity of those drugs:

> [D]angerous drugs are generally marketed in a diluted or impure form. ***If illegal substances are so distributed, then the General Assembly does not act irrationally or unreasonably when it addresses the marketing of the compound rather than the pure form of the drug.*** Drug dealers at the bottom of the distribution chain obviously need a source of supply if they are to make sales. It is equally clear that major traffickers need a network of

---

[50] While the Supreme Court has not settled the circuit split, Wiggins argues that current Federal Sentencing Guidelines have. The Guidelines' commentary appears to adopt the majority approach by saying that a "[m]ixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used." FCJ Federal Sentencing Guidelines Manual § 2D1.1. Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses).

[51] Opening Br. 12-14.

[52] Answering Br. 9.

people to make the actual sales to users. Stiff penalties for possession of a mixture that contains an illegal drug are therefore rational since traffickers may be less able to find street-level peddlers willing to risk possession of large, but diluted, amounts of illegal drugs.[53]

As this Court recognized in *Traylor*, Delaware's "market-oriented" Aggravated Possession scheme punishes offenders for possessing drugs that, even if in "a diluted or impure form," are still usable in the stream of commerce.[54]

Weighing only the marketable, or usable, amount of controlled substances for sentencing punishes the "possession of large, but diluted, amounts of illegal drugs" that the statutory scheme targets.[55] Excluding the additional weight of unmarketable components makes common sense and is also consistent with the goal of the statutory scheme. Unmarketable components do not dilute and increase the amount of ordinary drugs available on the market; they do not facilitate the distribution of the drug like the blotter paper in *Chapman*; and they present no financial advantage to drug dealers, who must remove the excess substance before selling.

Therefore, the plain meaning of "mixture," read in context with Delaware's statutory scheme, is consistent with the approach adopted by the Third Circuit and

---

[53] 458 A.2d 1170, 1177 (Del. 1983) (emphasis added). The defendant in *Traylor* was convicted under 16 *Del. C.* § 4753A (1983), which concerned aggravated possession for mixtures containing heroin. *Id.* at 1176.
[54] *Id.* at 1177.
[55] *Id.*

15

the majority of other federal circuits that have considered this issue; mixtures include only those compounds that are marketable or "usable in the chain of distribution."[56]

The State argues that this interpretation "narrow[s] the definition of *mixture* beyond its common understanding by introducing concepts of marketability and usability."[57]  To that end, the State contends that assessing a mixture's marketability or usability is inconsistent with Delaware law for two reasons: first, the common meaning of "mixture" is set by its dictionary definitions, which make no mention of marketability or usability; and second, this Court has previously affirmed convictions for Aggravated Possession without requiring the State to demonstrate marketability.  Both of these arguments fail.

### 1. Dictionary definitions

The State argues that the dictionary definitions of "mixture" establish a plain meaning that renders the vial's contents a "mixture" regardless of its usability.[58]  Merriam-Webster defines "mixture" as "a portion of matter consisting of two or more components in varying proportions that retain their own properties."[59]  Similarly, Oxford defines mixture as "a combination of different things in which the

---

[56] *Rodriguez*, 975 F.2d at 1007 (quoting *Rolande-Gabriel*, 938 F.2d at 1237).
[57] Answering Br. 10.
[58] *Id.* at 9.
[59] *Mixture*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mixture?utm_campaign=sd&utm_medium=serp&utm_source=jsonld. (last visited Mar. 20, 2019).

component elements are individually distinct."[60] Because the dictionary definitions do not reference a mixture's "usability," the State argues that requiring a drug compound to be marketable or usable reads additional requirements into the plain meaning of "mixture" that do not actually exist.

The dictionary definitions of "mixture," on their face, could describe almost any group of objects. It is hard to conceive of any group of materials that could not be described as "a portion of matter consisting of two or more components in varying proportions that retain their own properties." For example, that would include a combination of PCP and pennies or PCP and peanuts. And though those seem like an extreme hypotheticals, they help to illustrate the key point: the weight of foreign objects haphazardly (and perhaps unintentionally) mixed in with a controlled substance should not, as a matter of policy and logic, be considered as part of the controlled substance's weight for the purpose of determining the severity of the penalty to be imposed for possession. As the Supreme Court recognized in *Chapman*, common sense imposes a rational limiting principle on the dictionary definitions and prevents courts from applying the dictionary definition of "mixture" in ways that lead to absurd or nonsensical results:

> [N]onsense is not the necessary result of giving the term "mixture" its dictionary meaning. The term does not include LSD in a bottle, or LSD in a car, because the drug

---

[60] *Mixture*, LEXICO, https://www.lexico.com/en/definition/mixture. (last visited Mar. 20, 2019).

17

is easily distinguished from, and separated from, such a "container." The drug is clearly not mixed with a glass vial or automobile; nor has the drug chemically bonded with the vial or car.[61]

Like considering the weight of drug "containers," considering the weight of components that are not marketable or usable is an unrealistic application of mixture's dictionary definitions. Therefore, common sense dictates that such a construction "is not the necessary result of giving the term 'mixture' its dictionary meaning."[62] To conclude otherwise would result in courts imposing vastly different penalties for the same level of culpable conduct, undermining the fairness of the statutory scheme as a whole.[63] As the Third Circuit reasoned in *Rodriguez*, "[i]t defies logic to say that the two [defendants] should be sentenced differently under guidelines that were designed to penalize dealers for the amount of drugs they place

---

[61] *Chapman*, 500 U.S. at 462-63.

[62] *Id.* at 461-63. The Supreme Court also noted in *Chapman* that the federal sentencing scheme, which is remarkably similar to the Delaware statute, "intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, *ready for wholesale or ready for distribution at the retail level.*" *Id.* (emphasis added).

[63] For instance, a defendant arrested in the process of manufacturing methamphetamine would face a higher sentence because the total weight of other chemical byproducts would be included; in contrast, a defendant who completed the manufacture process would receive a lesser sentence for the same amount of usable drugs after distilling the methamphetamine and removing it from the byproduct. *Compare Walker*, 960 F.2d at 411-412 (convicting a defendant for possession based on the total weight of a liquid substance when "'over ninety-five per cent of the volume or weight of those liquids' was solvents") *with Rolande-Gabriel*, 938 F.2d at 1235 (rejecting the State's argument that a defendant should be sentenced for possession of 241.6 grams of liquid material that contained only 72 grams of consumable drugs).

into the market."[64]  Instead, the approach supported by this Court's opinion in *Traylor* and adopted by the majority of federal circuits provides a sound limiting principle to the dictionary definitions that correctly excludes weight of components that render the drug compounds unmarketable.

## 2. This Court's precedent

The State also argues that Delaware precedent conflicts with conducting any marketability analysis because "[p]rior decisions of this Court . . . have upheld convictions based on the weight of drug mixtures without requiring anything of the other substances in the mixture."[65]  To support its claim, the State points to this Court's opinions in *Lloyd v. State*[66] and *Shy v. State*.[67]

In *Lloyd*, this Court affirmed a conviction for the possession and sale of a mixture consisting of 2.77 grams of methamphetamine and 24.68 grams of unidentified powder.[68]  Similarly, in *Shy*, this Court affirmed a conviction where the defendant possessed a 22-gram mixture containing .64 grams of heroin and other unidentified powder.[69]  This Court affirmed the convictions in both cases despite the

---

[64] 975 F.2d at 1007.
[65] Answering Br. 9.
[66] 534 A.2d 1262.
[67] 459 A.2d 123.
[68] 534 A.2d at 1266.
[69] 459 A.2d at 124.

fact that the State did not test nor present any evidence as to the chemical makeup of the non-drug powder in the respective compounds.[70]

Here, the State argues that since the Court upheld the convictions in *Lloyd* and *Shy* without knowing the chemical makeup of the diluting powders, Delaware law must not require the State to demonstrate that controlled-substance compounds are marketable or usable.[71] The State's argument incorrectly characterizes both the State's burden and the evidence presented in *Lloyd* and *Shy*.

The Aggravated Possession statute does not require the prosecutor to present evidence showing a compound's entire chemical makeup. Instead, it requires only that the State present some evidence that the drug compound is "usable in the chain of distribution."[72] For example, the prosecution in *Lloyd* presented evidence that the defendant intentionally sold the diluted methamphetamine compound to a consumer.[73] Because the defendant sold the drug compound in the form intended for use by a known user, the State demonstrated that the compound was a marketable mixture in the chain of distribution and that the unidentified powder was a diluting agent.[74]

---

[70] *Lloyd*, 534 A.2d at 1266; *Shy*, 459 A.2d at 124.
[71] Answering Br. 9.
[72] *Rolande-Gabriel*, 938 F.2d at 1237.
[73] *Lloyd*, 534 A.2d at 1263-64.
[74] *Id.* at 1266.

20

Similarly, in *Shy*, this Court found that the entire 22-gram weight of the heroin mixture containing .64 grams of heroin should be used for sentencing when the State presented police testimony that "[t]his concentration . . . was typical of street-level heroin sold in the Wilmington area."[75] The police testimony established that the 21.36 grams of unidentified powder was conventionally used to dilute the drug and therefore was part of the mixture.[76] Thus, the State, in these prior Aggravated Possession cases, presented some evidence concerning a drug compound's marketability.

Therefore, both the plain meaning of "mixture" in Delaware's Aggravated Possession statute and this Court's precedent are consistent with considering only the weight of substances that are marketable and usable in the chain of distribution.[77]

### C. The State's Evidence Regarding the Alleged Mixture

The question here is whether a rational jury could find beyond a reasonable doubt that the brown chunks were anything but a foreign object (like a penny or a peanut) as opposed to a substance that was marketable or usable in the chain of distribution. The State presented evidence at trial that the PCP liquid and brown chunks were found in the same vial and that, together, the vial's contents met the

---

[75] 459 A.2d at 124.
[76] *Id.*
[77] 16 *Del. C.* §§ 4751C, 4752.

21

threshold weight for Aggravated Possession.[78]  The State did not present evidence or testimony concerning the nature of the brown chunks or their relationship to the rest of the PCP compound.  The State's own chemist testified that the brown chunks were visibly separate from the liquid PCP but that she did not know what the brown chunks were.[79]  Like the boric acid and cocaine compound considered by the Third Circuit in *Rodriguez*, the brown chunks here were visibly distinguishable and easily separated from the rest of the drug compound, and they were not thoroughly intermixed or bonded.[80]  There also was no evidence that brown chunks are routinely used in PCP distribution or that brown chucks are some form of cutting agent.  And there was no evidence here that the brown chunks were meant for or capable of consumption.

When Wiggins moved for judgment of acquittal prior to closing arguments and without the jury present, the State argued to the trial judge that "when you are ingesting PCP, you're not leaving behind any of the substance . . . why would it be in the vial if you're not taking it.  It is part of the mixture."[81]  But, the State never presented that argument to the jury; nor did it present any evidence supporting its claim that a drug user could actually ingest the brown chunks with the PCP.  During

---

[78] A20-24.
[79] A24.
[80] 975 F.2d at 1001-1006.
[81] A27.

closing arguments, the State argued that "[t]hose little brown things are mixed into a mixture of liquid that is PCP," "[i]t is a mixture contained within a single glass vial," and "a mixture is when two things are together."[82] But again, the State presented no evidence concerning what the brown chunks were, where they came from, how they got in the vial, whether they were ingestible, or whether they were in any way related to or associated with the liquid PCP. In sum, the State presented no evidence concerning the nature of the brown chunks at all.[83]

The standard for the State was not high, but it did require the State to present *some* evidence that the weighed components were a marketable or usable drug compound. Had the State offered any evidence to the jury that the chunks were a PCP byproduct, in the vial at the time of distribution, necessary for distribution, used for dilution, often a result of storing PCP, consumed along with PCP, or simply that they did not render the vial's contents unusable or unsellable, it very well could have met its burden. Although we must view all evidence in its favor, here the State offered no evidence about the chunks. The brown chunks could have been toxic particles that fell into the liquid by accident, clumps of residue present in the vial

---

[82] A32-33.

[83] The State attempts to draw a connection between the PCP liquid and the brown chunks on appeal, arguing that "[t]he brown chunks floating in Wiggins's PCP are akin to impurities in the drug." Answering Br. 13. But again, there is no evidence supporting that assertion, and after-the-fact speculation about the brown chunks cannot cure the insufficiency of the State's evidence at trial.

23

before the PCP was poured in, or solidified portions of the liquid PCP. We have no way of knowing.

The State had the opportunity to chemically test the brown chunks, to remove the chunks and weigh the liquid PCP separately, and to submit testimony concerning a relationship between the components or the appearance of similar brown chunks in other PCP cases. It did none of those things. Instead, the State relied only on the fact that the chunks and liquid were co-located in the same vial, shown by the photos of the vial and Moody's testimony. But evidence that the PCP and brown chunks were co-located does not demonstrate that the brown chunks were usable in the chain of distribution or somehow enhanced the marketability (that is, increased the price) of the liquid PCP.[84]

The State had the burden to prove each element of Aggravated Possession. It failed to present any evidence that the brown chunks, as a weighed component, were

---

[84] Moreover, it is unclear under these facts that the State could have met its burden even if this Court had adopted the reasoning of the First, Fifth, and Tenth Circuits. Even in those cases, the unmarketable components weighed by the State still had more significant connections to the drug compounds than just co-location. For example, in *Walker*, the Fifth Circuit included in the weight of methamphetamine and toxic liquid waste product "left over from the methamphetamine manufacturing process." 960 F.2d at 412. More than just being found in the same crockpot, the waste product was instrumental in producing the drug. *Id.* Likewise, in *Mahecha-Onofre*, the First Circuit included the entire weight of suitcases that were constructed out of "2.5 kilograms of cocaine bonded chemically with the acrylic suitcase material." 936 F.2d at 624-26. Even though the drug compound was unmarketable in the suitcase form, the usable and unusable components were connected via chemically bonding. *Id.* Here, by contrast, the State presented no evidence of any relationship between the liquid PCP and the brown chunks outside of their co-location within the glass vial.

24

part of the mixture containing PCP. The State also presented no evidence concerning the weight of the liquid PCP absent the brown chunks. For these reasons, we hold that no rational jury could have found that the brown chunks were part of a mixture that met the threshold weight for Tier 3 Aggravated Possession. Thus, the trial court erred in denying Wiggins's motion for judgment of acquittal.

## IV. CONCLUSION

Based on the foregoing, the Superior Court's conviction for Tier 3 Aggravated Possession is REVERSED, and we REMAND for re-sentencing based on the lesser offense of Misdemeanor Possession.

**VAUGHN**, Justice, Dissenting:

I dissent because I believe the jury could rationally conclude that the contents of the vial were a mixture.

A jury's duty is to determine the facts from the evidence, apply the law as given by the judge to the facts as the jury finds them, and in that way decide the case.[1] A motion for judgment of acquittal asks the court to determine whether a rational juror, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt.[2] Because it asks whether a rational, rather than a reasonable, juror could find the defendant guilty, it is a deferential standard, recognizing the jury's constitutional role as trier of fact.

The Majority holds that the meaning of the word "mixture" requires a showing that the mixture is marketable or usable and that under this definition no rational juror could find the contents of the vial were a mixture. The Controlled Substances Act, however, does not contain any provision requiring that a mixture be marketable or usable. It does not contain any definition of the word mixture or any provision

---

[1] *See* Del. Const. art. IV, § 19 ("Judges shall not charge juries with respect to matters of fact, but may state the questions of fact in issue and declare the law."); *see also Herring v. State*, 805 A.2d 872, 876 (Del. 2002) (elaborating that Article IV, § 19 of the Delaware Constitution serves to delineate the respective roles of judge and jury in jury trials with the purpose of "protect[ing] the province of the jury on factual issues" while leaving unrestrained the trial judge's role "in either passing upon the legal admissibility of evidence or in instructing the jury on the law").

[2] *E.g., Pardo v. State*, 160 A.3d 1136, 1149-50 (Del. 2017).

1

which bears upon the meaning of the word.[3] Since there is no statutory definition of the word mixture, I think the sufficiency of the evidence should be tested against the legal principles explained to the jury by the court in its instructions. The trial judge instructed the jury that "where I have not defined a word, such word has its commonly accepted meaning."[4] The issue before us then, in my view, is whether a juror following the instruction to give the word "mixture" its commonly accepted meaning could rationally find that the contents of the vial were a mixture beyond a reasonable doubt.

The instruction given by the trial judge is actually derived from Title 11,[5] but it is routinely given as a standard instruction in both Title 11 and Title 16 cases. It is consistent with 1 *Del. C.* § 303, which provides that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language."

The charge of Aggravated Possession required the State to prove that the defendant possessed 15 grams or more of a mixture containing PCP.[6] In looking at

---

[3] 16 *Del. C.* § 4701 (defining terms for purposes of Delaware's Controlled Substances Act). Although the General Assembly has amended § 4701 several times since Wiggins's February 22, 2018 arrest, it has left "mixture" undefined. *Compare* 16 *Del. C.* § 4701 (2018), *with* 16 *Del. C.* § 4701 (2020).

[4] A34.

[5] 11 *Del. C.* § 221.

[6] 16 *Del. C.* § 4752(4), *amended by* 82 Del. Laws ch. 217, § 6 (2019) (prohibiting the aggravated possession, including possession of a Tier 3 quantity, of a controlled substance); 16 *Del. C.* § 4751C(3)(f), *amended by* 82 Del. Laws ch. 217, § 4 (2019)

2

the evidence, the primary testimony concerning the contents of the vial came from the forensic chemist who tested it. The evidence shows that she applied the testing procedure that a forensic chemist would apply to a mixture. When an illegal substance is part of a mixture, there are two relevant factors: (1) the presence of the illegal substance and (2) the weight of the entire mixture. The chemist first tested for the presence of an illegal substance and found that the liquid was PCP. She then weighed the entire contents of the vial. She did not separately weigh the PCP and the brown substance, because in a mixture the relative weight of the PCP and the brown substance is not relevant. She did not identify the brown substance because its identity was not relevant. The State had no burden, in my opinion, under Title 16 to establish that the brown substance was marketable or useable in connection with the PCP.

The State and the defendant, knowing that the jury would be instructed to give undefined words their commonly accepted meaning, were both entitled to rely on that instruction. Both parties were aware they could argue to the jury that the contents of the vial were, or were not, a mixture. There was nothing unusual about the way the State presented its evidence in this case.

---

(classifying the possession of 15 grams or more of PCP or a mixture containing the same as a Tier 3 quantity of a controlled substance).

3

In closing arguments, the State made the following argument about the PCP:

> The indictment, which is also included in here, talks about a mixture containing any of the substances.
>
> Why is that important? Because there's little brown things floating about in that PCP. Those little brown things are mixed into a mixture of liquid that is PCP. The weight of the PCP or the mixture containing it is 17. some grams. . . . It is a mixture contained within a single glass vial taken [from] Mr. Wiggins[].[7]

In his closing, defense counsel countered as follows:

> Do you remember the medical examiner said she didn't test what the solids were. She doesn't know what they are. And you remember she said she weighed them together without knowing what they are. And really the question you will have when you go back there, the question I think you will spend most of your time on is, what is a mixture? At the end of the day, that's your call. That's not my call. It's not the State's call. It's not the Judge's call. What is a mixture? Is a mixture solids inside of a liquid? I mean a mixture is like brownie mix. You can put the brownie mix, the egg and the milk in there and then you mix it up. You can't really take those things apart and tell what they are. They're together. It's one thing. It's like if someone was making pot brownies. You don't know how much of that is weed and how much of that is brownie. It's a mixture. You can't separate those things out.
> But here we have a solids inside of a liquid. We have different ways of doing it. But there's a way to separate those things to make them not a mixture and tell us just how much PCP we have and tell us how much whatever the other substance is that's in there.[8]

---

[7] A32.
[8] A33.

Defense counsel urged the jury to find that the contents of the vial were not a mixture because the PCP and the brown substance could be separated. He argued that, in a mixture, "[y]ou can't separate those things out."[9] The contents of the vial were not a mixture, he argued, because "there's a way to separate those things to make them not a mixture."[10] The defendant has continued to make that argument on appeal. In his opening brief, the defendant argues that "[b]ecause the chunky substances could be easily distinguished and separated from the liquid, the two substances were not a mixture."[11]

The defendant's argument describes a homogeneous mixture. The contents of the vial are obviously not a homogeneous mixture. The problem with the defendant's argument is that a mixture can also be heterogeneous. In its answering brief, the State offers two dictionary definitions of mixture which describe a heterogeneous mixture. Merriam-Webster defines mixture as "a portion of matter consisting of two or more components in varying proportions that retain their own properties."[12] Oxford defines mixture as "[a] combination of different things in which the component elements are individually distinct" or, as in chemistry, "[t]he product of the random distribution of one substance through another without any

---

[9] *Id.*
[10] *Id.*
[11] Opening Br. 8.
[12] *Id.* at 9 (quoting *Mixture*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mixture (last visited Apr. 3, 2020)).

5

chemical reaction."[13]  In other words, matter consisting of two or more components or a combination of different things can be considered a mixture even if the individual parts of the mixture remain distinct and can be separated out of the mix.

"Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined [in a statute]."[14]  Dictionary definitions should be considered with some caution, however, as different definitions appear in different dictionaries.  The usefulness of dictionary definitions may vary depending on the facts of a case, but they can serve as helpful guides in determining the plain or commonly accepted meaning of a word.

The Majority rejects these dictionary definitions on the grounds that "on their face, [they] could describe almost any group of objects."  They cite *Chapman v. U.S.* for the proposition that common sense imposes a rational limiting principle on dictionary definitions and prevents courts from applying a dictionary definition in a way that leads to absurd or nonsensical results.  That, of course, is true.  No one could rationally argue that the vial itself in this case, for example, was part of a mixture with the PCP.  If that was the State's theory, I would agree that no rational juror could find that the vial itself and the PCP were a mixture.  I would also agree

---

[13] *Id.* (quoting *Mixture*, LEXICO, https://www.lexico.com/definition/mixture (last visited Apr. 3, 2020)).

[14] *Dickerson v. State*, 975 A.2d 791, 798 n.16 (Del. 2009) (alteration in original) (quoting *Cephas v. State*, 911 A.2d 799, 801 (Del. 2006)).

6

that if a container held PCP and pennies, or PCP and peanuts, or PCP and some other such thing that was obviously nothing more than a foreign object, the State could not proceed on a mixture theory, and if it tried to do so a motion for judgment of acquittal should be granted. But cases should be decided on their own facts, not hypotheticals. Here, the brown particles were floating in the PCP. The issue is whether a juror could rationally find that the combination of the brown particles and the PCP was a mixture, giving the word its commonly accepted meaning. I think that a juror could rationally decide that the meaning of the word "mixture" is broad enough to cover the PCP and the brown particles. Whether I think the contents of the vial were a mixture, or even whether a reasonable juror would think they were a mixture, is not relevant.

For me, the analysis would end there. I think the federal cases discussed by the parties in their briefs and the Majority in its opinion are beside the point. The jury had no knowledge of such cases. I do not believe that those cases can have any bearing on what the jury could rationally conclude from the evidence it heard. In addition, the cases mentioned involve legal interpretations of the word mixture in federal sentencing statutes and guidelines.[15] This case involves a question of fact

---

[15] *Chapman v. United States*, 500 U.S. 453, 461-62 (1991); *Griffith v. United States*, 871 F.3d 1321, 1330-31 (11th Cir. 2017); *United States v. Killion*, 7 F.3d 927, 929 (10th Cir. 1993); *United States v. Rodriguez*, 975 F.2d 999, 1004 (3d Cir. 1992); *United States v. Bristol*, 964 F.2d 1088, 1089-90 (11th Cir. 1992) (per curiam); *United States v. Robins*, 967 F.2d 1387, 1391 (9th Cir. 1992); *United States v. Sherrod*, 964 F.2d 1501, 1509 (5th

7

submitted to a jury. The standards of review are different.[16] I also do not think that the description of the Controlled Substances Act as a "market-oriented" classification scheme[17] is of any helpful relevance in the context of a motion for judgment of acquittal. The jury was not asked to consider this scheme in its deliberations over whether the State had proven, beyond a reasonable doubt, that the defendant was guilty of Aggravated Possession of PCP.

The power to define crimes belongs to the General Assembly, not this Court, and the public is entitled to have a criminal statute enforced exactly as enacted by the General Assembly.[18] The Controlled Substances Act now includes 52 statutory

---

Cir. 1992), *cert. denied sub nom. Sewell v. United States*, 507 U.S. 953 (1993); *United States v. Acosta*, 963 F.2d 551, 553 (2d Cir. 1992); *United States v. Walker*, 960 F.2d 409, 412-13 (5th Cir. 1992), *cert. denied sub nom. Walker v. United States*, 506 U.S. 967 (1992); *United States v. Jennings*, 945 F.2d 129, 134-35 (6th Cir. 1991); *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1233 (11th Cir. 1991); *United States v. Mahecha-Onofre*, 936 F.2d 623, 625 (1st Cir. 1991).

[16] This Court typically reviews *de novo* the Superior Court's interpretation of a statute, *Dennis v. State*, 41 A.3d 391, 393 (Del. 2012), but in this case, while we review the denial of a motion for judgment of acquittal *de novo*, we are tasked with applying a more deferential standard of review in considering whether any rational juror, viewing the evidence in the light most favorable to the State, could have concluded beyond a reasonable doubt that the substances inside the vial constituted a mixture of PCP, *see Pardo*, 160 A.3d at 1149-50.

[17] As recognized in *Traylor v. State*, 458 A.2d 1170, 1177 (Del. 1983) (finding that Delaware's Controlled Substances Act withstood equal protection scrutiny because a rational basis for the Act existed and concluding that such a rational basis existed by favorably comparing the Act with similar statutory regimes as interpreted by courts in Florida, Illinois, Michigan, and New York).

[18] *See State v. Sturgis*, 947 A.2d 1087, 1090-91 (Del. 2008) (discussing the separation of powers inherent in Delaware's constitutional structure, warning against the encroachment of one branch on the province of another, and recognizing the General Assembly's role in defining and attaching punishments to crimes).

definitions, but the General Assembly has not chosen to enact a definition of "mixture."[19] The General Assembly has not included any language in the Act which narrows the meaning of "mixture" by requiring a showing that the mixture be marketable or useable or that a drug compound be usable in the chain of distribution. It has left the meaning of the word mixture, like any other undefined word, as a question of fact to be decided by a jury, guided only by the standard instruction that the jury is to give undefined words their commonly accepted meaning. Our role is simply to decide whether a juror so instructed could rationally conclude that the contents of the vial were a mixture. I believe a juror could rationally so find, and I would affirm the judgment of the Superior Court.

---

[19] *See* 16 *Del. C.* § 4701.